In re Stanley Norman KOUSHEL, Josianne Micheline Koushel, Debtors.

COSALT EXPORTS LIMITED, Plaintiff,

v.

Stanley Norman KOUSHEL, Josianne Micheline Koushel, Defendants.

Bankruptcy No. 80–00097.
Adv. Proceeding No. 800365.

United States Bankruptcy Court,
E. D. Virginia,
Norfolk Division.

June 9, 1981.

J. P. Janetatos, Elizabeth W. Dodge, Baker & McKenzie, Washington, D. C., Bruce A. Kayuha, Willcox, Savage, Lawrence, Dickson & Spindle, P. C., Norfolk, Va., for plaintiff.

Stuart H. Held, Christie & Held, Virginia Beach, Va., for defendants.

HAL J. BONNEY, Jr., Bankruptcy Judge.

This—an interesting and important case featuring international implications (four nations) to test whether business associates defrauded their corporate partner. Following a very lengthy trial, the Court took the decision under advisement and now, at length, this is that decision.[1]

After Stanley and Josianne Koushel [the debtors] filed a joint petition for bankruptcy, Cosalt Exports Limited, the plaintiff, filed a complaint for the determination of the dischargeability of its debt. When the plaintiff dismissed the case as settled, the parties failed to effect the compromise settlement and the plaintiff filed a motion to reinstate the cause of action on the docket of the Court. The defendant alleged that the agreement of the parties to settle the litigation constituted an accord and satisfaction. A separate hearing on this issue was held with the Court ruling against the defendants. 6 B.R. 315 (Bkrtcy.1980). The parties then proceeded to prepare for trial.

A final pre-trial conference was conducted at which the Court ruled upon the admissibility of exhibits, the qualification of witnesses and the statement of issues presented. The case proceeded to trial.

A few years ago the defendants were residing in free Germany and there began selling designer mirrors[2] to service and service-related personnel on United States military installations in the mid-1970's. At that time they traded under the name Koushels Distributors and Service, GmBH. Though not overly prosperous, this business met expenses and paid the Koushels a salary. Unfortunately, the business inventory was stolen precipitating the debtors into German bankruptcy. (Mr. Koushel had been in bankruptcy in this District in 1964.) Several months after this, the debtors began Mirror Decorations, another outlet for designer mirrors. Thus began the intricate factual pattern giving rise to the present litigation.

Mirror Decorations was registered in Germany in the name of Mrs. Koushel. Al-

1. Some opinions of courts are so lengthy they might be bound and sold in bookstores as nonfiction or fantasy. This Court heartily concurs with the Judicial Conference of the United States and the Court of Appeals for this Circuit that decisions be made from the bench if possible and opinions reduced in instances in which no important legal precedent was being set. Some tend to recite every fact when it might be simpler to attach a transcript to a brief legal opinion.

Most decisions here are rendered orally. This is a lengthy opinion; rare. However, we see here a classic example of business relations which can well serve as our benchmark for future reference.

2. Designer mirrors are those interesting glass mirrors with famous logos overlayed. The overlay might be Nipper for RCA or the "Pause That Refreshes" for Coca-Cola. Most popular are those touting beers and whiskeys.

though the debtors attempted to hide this fact at trial by explaining that the company was registered in the name of Mrs. Koushel, a French national, solely for means of expediency, it is clear from the documentary evidence and the testimony adduced at trial that Mrs. Koushel was quite involved in the day-to-day and long-range operating decisions of the company. Although denied by the Koushels, she was described as a tough negotiator and competent businesswoman by Mr. Denys Petchell, the former Managing Director, and Victor Fox, a supervisor, both of Cosalt Export Limited. Mr. Petchell had constant contact with the debtors over the course of approximately 15 months.

Shortly after it began operating, Mirror Decorations secured a contract with the Army and Air Force Exchange Service, Europe, [AAFES] which operates post exchanges on the American bases on the continent. Mirror Decorations was given the right to sell mirrors to service personnel at a stand within the post exchanges. This was a substantial improvement over their previous method of conducting business—operating out of a truck.

In setting up shop, a minimum outlay of capital was required. The only things needed were shelving, a cash box, some miscellaneous hardware and a trained employee or two. The exchange furnished the floor space and the mirrors provided a decorative, colorful motif.

The AAFES contract served as the basis for the initial negotiations between Mirror Decorations and Cosalt, an English manufacturer of decorator mirrors on the River Humber near the North Sea. The debtors initially approached Cosalt because they were not getting satisfactory service from other distributors. The debtors hoped that Cosalt, a multinational firm with headquarters in Grimsby, England, would be able to provide quality products for sale in conjunction with good service. The negotiations between the parties began upon that premise.

Cosalt was very interested in Mirror Decorations, largely because of the AAFES contract. It projected a huge market for mirrors on the basis of the existing shops and those opened in the future. The debtors undoubtedly cultivated this impression by pointing to their existing shops and expressing expectations relative to the proposed opening of additional shops.

The original agreement between the parties is dated October 14, 1977. By that agreement the parties agreed to the fundamental disposition of the proceeds from the sale of mirrors—30% of the gross to AAFES, 70% of the remainder [49% of the gross] to Cosalt, 18.35% of the remainder [12.845% of the gross] to Mirror Decorations and the remainder to a joint account between Cosalt and Mirror Decorations.

As might be expected in a business that was expanding quickly, Mirror Decorations could not generate enough money from the operation of the business itself to expand as rapidly as it and Cosalt had expected. In an October 17, 1977, letter to Mr. Sydney Haywood of the International Westminster Bank, Limited, Mr. Petchell indicated that Cosalt would guarantee 30,000 Deutchmarks [DM] for additional wages, transport and other expenses.

Here appeared to be an inconsistency in the testimony on this point. Both of Cosalt's principal witnesses contended that the money was to be used for capital expansion only. However, the documentary evidence and the plaintiff's own statement of the issues in the case directed the inquiry into a determination of whether or not the money was used for a business purpose.

That notwithstanding, it became immediately clear to Cosalt that Mirror Decorations was not expanding rapidly enough. Rather than the forty stores promised, Mirror Decorations was only operating eight permanent stores and perhaps a dozen mobile ["rovers"] locations. This was clearly unsatisfactory from Cosalt's standpoint.

Cosalt increased its guaranty to the Koushels/Mirror Decorations from 30,000 DM to 48,000 DM by an indemnification agreement executed on December 16, 1977.

By February 14, 1978, Cosalt had again increased its guaranty, this time to 73,000 DM. Once more the defendants individually and as principals of Mirror Decorations acknowledged the debt and agreed to pay Cosalt according to a specific repayment schedule. [See plaintiff's exhibit # 29]. As noted, there is some uncertainty concerning the exact use to which the money was to be put. There is no uncertainty that no part of it was ever repaid; it was not.

At approximately the same time, Cosalt contracted AAFES in order to bid for the contract held by Mirror Decorations. The Koushels angrily contacted Mr. Petchell and stated that they felt the action was a violation of the contract between Cosalt and Mirror Decorations. Mr. Petchell made it abundantly clear that Cosalt intended to live up to the letter and spirit of the original contract. Apparently cooler heads prevailed and the evidence indicates that the Koushels assisted Cosalt in the subsequent solicitation of AAFES. Their joint efforts were successful and Cosalt secured the contract. After Cosalt secured the contract, it immediately designated the Koushels, trading as Mirror Decorations, their exclusive agents. Despite this change, the terms of the relationship between the parties remained essentially the same.

Mirror Decorations was still unable to expand quickly enough to turn a profit. Cosalt again increased its guaranty, this time to 120,000 DM. As usual, Cosalt issued the appropriate instructions to International Westminster Bank, Limited, which always promptly transferred the money to the Koushels' account at Dresdner Bank in Frankfurt.

Almost immediately after the latest increase, Mrs. Koushel directed the International Westminster Bank to transfer all of the money received from AAFES into Mirror Decorations account. This was in direct contravention of the agreement between the parties who promptly exchanged caustic communications. Apparently the incident died an uneventful death; it nevertheless left a bad feeling in the relationship between the parties. Counsel for the plaintiff hoped to establish this as another link in the chain of fraud they allege was perpetrated by the defendants.

Less than two weeks after this problem, Cosalt became aware of extreme difficulties with the German customs authorities relative to importation of its mirrors. Normally, the Koushels would submit a custom receipt known as a T-Z transit document to their accountant who would verify to the customs officials that the mirrors had been sold in a duty free zone, i. e., the American bases.

Although Cosalt consistently pressed Mr. Koushel for the document, he always responded with some variation on the proverbial runaround. The document never has appeared. No satisfactory explanation has been offered to explain this disappearance of it.

As a result of its inability to secure the T-Z transit document, Cosalt was forced to pay the customs authorities in excess of 49,000 DM. Needless to say, they have not seen any of this money since.

By this point in time the relationship between the parties had deteriorated to the point where prodigious amounts of time were wasted warily circling one another in constant expectation of the next salvo. In late August 1978, Mr. Koushel contacted Mr. Petchell and complained that he had not been paid in several months. Another round of correspondence began and the problem was resolved in Koushel's favor. On September 1, 1978, Cosalt released 37,-200 DM to Mr. Koushel on behalf of Mirror Decorations.

By this time the defendants had clearly had enough. In the summer of 1978 Mr. Koushel made a furtive trip to the United States for the purpose of renting a house for his family in Virginia Beach, Virginia. In early September Mr. Koushel told Mr. Petchell that Mrs. Koushel had been injured in an auto accident in Mets, France, when actually she was in the United States living in the house her husband had secretly rented for her. During all of this, Mr. Petchell thought that Mrs. Koushel, as an owner and a principal operator of the business, would return when she had recovered.

At the same time the parties amended their original contract for the purpose of repaying the funds previously advanced by Cosalt. The agreement provided that Mr. Koushel was to receive $1,000 salary for September and $2,000 for October, November and December 1978. In addition Cosalt agreed to pay the expenses of the operation. According to the contract, these were not to exceed $8,500 per month. The agreement was executed by Mr. Koushel on behalf of his wife by virtue of a written power of attorney. The expenses for the period never remotely approached $8,500 per month; that figure was routinely doubled and almost tripled. [One U. S. dollar equals approximately 2 DM.]

For example, on October 6, 1978, Mr. Koushel requested approximately 49,000 DM, 32,000 DM for expenses and 17,000 DM for capital expenditures. Cosalt sent the money as requested. On November 15, 1978, Mr. Koushel requested 24,556 DM; again the money was forwarded. On December 8, 1978, Mr. Koushel requested 31,-433 DM which was also paid.

In the December 8th request Mr. Koushel indicated that he would be going to the United States for the holidays.

Mr. Koushel left Europe to rejoin his family in the latter part of December 1978. He moved in with his wife and children in the home he had rented some six months earlier. Mrs. Koushel had lived there since midsummer.

When she came to this country, Mrs. Koushel brought with her approximately $6,000. She testified that she and her husband had saved by mid-1979 some $15,000 to $20,000. It was never adequately explained how the debtors accumulated this money, for in depositions Mr. and Mrs. Koushel admitted that they were essentially broke at the time they started Mirror Decorations. Cosalt naturally questioned the source of these funds.

In essence, Cosalt argues that the funds provided by it to the Koushels were not used for the purpose intended.

## The Law Applied To The Facts

In its complaint to save its debt from the discharge of the Koushels, Cosalt brought its action upon four theories of bankruptcy dischargeability law: false representations, actual fraud, false financial statement and embezzlement. The Court's final pre-trial order reduced these to two:

1. Whether defendants falsely represented to plaintiff that defendants would apply any funds advanced to defendants by plaintiff to plaintiff's business and to reimburse defendants for such expenses already paid by them.

2. Whether defendants committed defalcation by misappropriating funds transferred to them by plaintiff for expenses relating to plaintiff's business and by failing to properly account for such funds.

■■■ Understand from the onset that false representation and false pretenses are each separate and distinct grounds for alleging a debt to be nondischargeable in bankruptcy. *In re Warren*, 498 F.2d 1399 (4th Cir. 1974). Therefore, we consider here false representations.

The best known case in the land on this is *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540 (W.D.Va.1967). It is almost always cited by appellate courts. *Griffin v. Swain*, 577 F.2d 734 (4th Cir. 1978). *In re Maxwell*, 75–338–NN (E.D.Va.1976). Upon this theory a debtor must have made a representation which he knew at the time to be false, must have made it with the intent and purpose to deceive, resulting, if the creditor relied upon it, in the creditor sustaining loss and damage as a proximate result.

There is, however, one fine point usually overlooked by a plaintiff in such action challenging the discharge of its debt. District Judge Clarke emphasized it in reversing this Court in the *Maxwell* case cited above. There must exist at the time, *from the very onset*, an intent to deceive. The intent may not follow the representation. In the parlance of the street, one must scheme from the inception to *take* the creditors.

The plaintiff would have the following loans to the business excepted from discharge upon the premise they were obtained by false representations:

| November | 2, | 1977 | 10,000 DM |
|----------|-----|------|-----------|
| November | 11, | 1977 | 20,000 DM |
| January | 25, | 1978 | 43,000 DM |
| May | 15, | 1978 | 47,000 DM |
| | | | 120,000 DM. |

The action of the plaintiff is sweeping; it would have every alleged debt found non-dischargeable, but this is simply not the case. It would cast upon the Koushels total responsibility for the failure of Mirror Decorations when, in truth, such factors as insufficient cash flow caused the failure. All of the losses do not fall at the feet of the defendants.

■ The Court is of the opinion that the evidence is not clear and convincing that the 120,000 DM were obtained by false representation or that those funds found their way into the pockets of the Koushels. The plaintiff bases much of its case on pure conjecture. As for the loans totaling 120,-000 DM, it sent money at almost every request arguing now that this was to go toward expansion but clearly required for ordinary and current operations. It is a gross grab for the ring to argue that all was being dissipated.

A clear tracing to the 120,000 DM of misappropriated funds cannot be made. The plaintiff can by conjecture point in the direction, but mere pointing is insufficient.

"It is well settled that the provisions of the bankruptcy act relating to discharge are to be construed liberally in favor of the bankrupt." *Roberts v. Ford*, 169 F.2d 151 (4th Cir. 1948)

Earlier the Court of Appeals for the Fourth Circuit had used the opposite language, "construed strictly against the objector." *Royal Indemnity Co. v. Cooper*, 26 F.2d 585 (4th Cir. 1928). See *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1914).

The facts here will not support the proposition by evidence which is clear and convincing, *Brown v. Buchanan*, 419 F.Supp. 199 (E.D.Va.1975), that the Koushels intended from the very start to take or misuse Cosalt's funds. Clearly, there was no pre-conceived scheme. That they later misused the funds is another matter. Indeed it is. But on the issue of false representations, the Court finds for the defendants. A forthright business venture was entered into by the parties, all of them hoping and expecting, sincerely, that it would be a success.

By evidence clear and convincing it is abundantly clear that the Koushels did deliberately misappropriate some of Cosalt's money after receiving it.

The demeanor and credibility of the witnesses are particularly pertinent here, for the Court is, in essence, hearing two sides of a business arrangement. Such arrangements are by their nature complex, speculative and difficult to reconstruct. Distance, too, was a complicating factor. We must, therefore, look to the people for interpretations of the history of their dealings.

Mr. Koushel was not a strong convincing witness on his behalf. His frequent responses to questions were "I don't know" and "I don't remember." In addition to a vague defense as opposed to a definite prosecution, lying and concealment of facts weigh heavily against the defendants.

It was quite a contrived story to tell principals of Cosalt that Mrs. Koushel had been injured in an automobile accident in France when she was in fact in the United States with several thousands of dollars withdrawn from the German account. This was indeed a clear deception of Mr. Petchell who anticipated her return, upon recovery, to the business. One must conclude from the evidence that a pattern of untruths existed running from Mrs. Koushel not being closely involved in the business to the explanation for the accumulations of funds for a return to the States.

■ A princely sum in all was sent by Cosalt to the Koushels to develop the business. To be sure, it was forwarded by Cosalt in complete faith in the defendants and in the trust that it would be properly applied to their joint venture. Certainly not every pfennig sent was misappropriated

and it is difficult to make the distinction [see damages *infra*], but deliberate misappropriation is clear.

The areas of defalcation are these:

(1) Customs funds—Mirror Decorations, the Koushels, received 49,254 DM upon request and have made no showing that these funds were used to pay the customs tax on mirrors imported into West Germany. If properly applied, a receipt or other documentation would suffice.

The proximate result of this failure to pay the duty was the 30,000 DM bond required by the government and paid by Cosalt.

(2) Operating expenses—During the last four months of the existence of the Cosalt-Koushel relationship, September-December 1978, pursuant to the new working agreement of September, 1978, considerable funds, 97,611 DM, were advanced by Cosalt for operating expenses and some expansion. These are unaccounted for; defalcation occurred.

Much law is cited by the plaintiff on the grounds of defalcation, but sufficient is the case of *Hamby v. St. Paul Mercury Indemnity Co.*, 217 F.2d 78 (4th Cir. 1954). The other cases cited are obscure or limited. Too, citing a treatise is not a particularly strong approach. We realize briefs are often padded. But *Hamby* is clear and sufficient; the actions of the Koushels come easily within its rationale.

The defendants' reliance upon *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1935), is not well-placed. Although an old and respected case, its application is not as broad as some would make it. Its facts are limiting and it did not intend to preclude every situation but a *sure* trust.

Too, defendants rely on the Court's opinion in *Borg-Warner Acceptance Corporation and General Electric Credit Corporation v. Miles*, 6 B.C.D. 805, 5 B.R. 458 (Bkrtcy. 1980). We also think it is a good, sound opinion, but having written it, we know it does not save from nondischargeability all trust debts except express technical ones.

Indeed, real estate agents are a clear exception, for instance. There is no floor planning in the Cosalt-Koushel arrangement. Funds were shipped in to be used in certain ways. They were not.

A reading of *Davis v. Aetna, Hamby* and *Miles*, these three, will afford as clear a picture of the defalcation principle as one would wish or require.

The debt, or a part of it, is nondischargeable in bankruptcy.

### And Now, Damages

Several factors have propelled this proceeding into a major one. The trial was lengthy, the exhibits many, the testimony considerable. To separate the wheat from the chaff has not been easy. The result is that while there was no fraudulent scheme to take plaintiff's money, there was deliberate misappropriation. As a result, a debt develops which is not dischargeable in bankruptcy. An equally difficult task, now, is to pinpoint damages.

It would be easy, but unjust, to simply say, as plaintiff argues, that all of it survives bankruptcy, a claim for 296,865 DM. As set forth *supra*, the funds relating to the customs problems are clearly nondischargeable: 49,254 + 30,000 DM = 79,254 DM. Further, the 97,611 DM supplied for operating expenses would be nondischargeable, but less legitimate expenses incurred and paid.

The Court rejects as increditable evidence the debtors' envelope of receipts admitted into evidence by way of explanation of expenses paid. They are indefinite, duplicitous and certainly not properly maintained in the usual course of business. They are, in essence, whatever the debtors could put their hands on. Authorized operating expenses for September-December 1978 were 17,000 DM per month for a total of 68,000 DM. This must be deducted from the 97,611 DM for a defalcation figure of 29,611 DM.

Therefore, the total debt the Court finds to be nondischargeable in the debtors' bankruptcy is 108,865 DM (79,254 DM + 29,611 DM) or $44,090.32 at the rate of exchange

in Norfolk this 9th day of June, 1981 [1 DM = $.405 U.S.] and for this the Court enters judgment for the plaintiff and against the defendants.

IT IS SO ORDERED.

### Epilogue

As noted in the first footnote, this is a case of some importance. Most bankruptcy cases, indeed the vast majority, are consumer cases and any challenge to dischargeability normally involves a financial statement alleged to be false.

The others, and this is one, have business connotations. Usually such business arrangements involve trust reposed in partners or employees by principals. In any business venture there is, obviously, risk. It is one of the hallmarks of the free enterprise system. It becomes an extraordinary risk, however, if one of the parties is dishonest. It is a risk not to be begged. One who supplies capital has the right to expect that it will be honestly applied, but cannot complain if the business otherwise fails.

The plaintiff here has gone to great lengths and extraordinary costs to prosecute his matter. Ah, far more spent than could ever be awarded or recovered. Fortunately, it possesses the resources to do so. It is apparently more a matter of principle than Deutchmarks. And that is good. The message should be, as they say, "loud and clear." Business will not tolerate dishonesty and will pursue it relentlessly. This case will stand for that proposition.

Here the lessons for business associates are five:

1 —Enter into a business relationship cautiously,

2 —If it does not succeed depart honorably,

3 —Treat funds as sacred,

4 —Maintain accurate records,

*and*

5 —Consider the risk!

A copy of this opinion and order shall be forwarded to counsel of record, the debtors, and Mr. Denys Petchell, of Cosalt.