In re TRIANGLE INVESTMENT ASSO-
CIATES B-1 d/b/a Lafayette Associ-
ates-Limited Partnership, J. Andre Pel-
letier and William L. Dickey, General
Partners, Bankrupts.

In re TRIANGLE INVESTMENT ASSO-
CIATES B-3 d/b/a Greenleaf Associ-
ates-Limited Partnership, J. Andre Pel-
letier and William L. Dickey, General
Partners, Bankrupts.

In re TRIANGLE INVESTMENT ASSO-
CIATES B-2 d/b/a Whittier Associates-
Limited Partnership, J. Andre Pelletier
and William L. Dickey, General Part-
ners, Bankrupts.

MASSACHUSETTS ELECTRIC
COMPANY, Plaintiff,

v.

TRIANGLE INVESTMENT ASSOCIATES
B-1 d/b/a Lafayette Associates-Limited
Partnership, J. Andre Pelletier and Wil-
liam L. Dickey, General Partners,

Triangle Investment Associates B-3 d/b/a
Greenleaf Associates-Limited Partner-
ship, J. Andre Pelletier and William L.
Dickey, General Partners,

Triangle Investment Associates B-2 d/b/a
Whittier Associates-Limited Partner-
ship, J. Andre Pelletier and William L.
Dickey, General Partners, Defendants.

Bankruptcy Nos. 77-1647-L to 77-1649-L.

United States Bankruptcy Court,
D. Massachusetts.

Jan. 27, 1982.

Richard A. Savrann, Singer, Stoneman,
Kunian & Kurland, Boston, Mass., for de-
fendants.

Victor L. Hatem, Hatem & Mahoney,
North Andover, Mass., for Massachusetts
Elec. Co.

## MEMORANDUM ON THE DISCHARGE-ABILITY OF A DEBT

THOMAS W. LAWLESS, Bankruptcy
Judge.

On July 21, 1977, J. Andre Pelletier and
William L. Dickey (hereinafter referred to
as "Defendants") individually and as Gener-
al Partners of three limited partnerships
voluntarily commenced a case under Chap-
ter 12 of the Bankruptcy Act. On July 27,
1977, a trustee was appointed. The Debtors
were subsequently adjudicated bankrupts
as a result of their failure to file an indem-
nity bond. A first meeting of creditors was
held, after which the Massachusetts Electric

Company (hereinafter referred to as "Plaintiff") filed a complaint to determine the dischargeability of a debt.

The Plaintiff alleges that the Defendants, in their capacity as managers of partnership property, tampered with Plaintiff's electric meters and thereby obtained electricity for which they were not charged. Plaintiff contends that this diversion of electricity constituted a fraud upon the Plaintiff for the purposes of § 17(a)(2) of the Bankruptcy Act[1] and, therefore, it should be determined that the estimated $78,933.99 debt which arose from the diversion is a nondischargeable debt of the Defendants.

Hearings on the Plaintiff's complaint were held on June 18, June 23 and July 9, 1981, during which exhibits were offered and testimony was recorded in three separate transcripts (hereinafter referred to in chronological order as transcripts 1, 2 and 3). After consideration of all the evidence I find the facts to be as follows:

Between 1973 and 1974 the Defendants entered into three limited partnership agreements for the purpose of acquiring and operating ten apartment buildings (transcript 2 at 22). The individual partnerships were elements of a larger entity known as Triangle Investment Associates. The partnerships were composed in the aggregate of approximately thirty limited partners, some of whom held interests in more than one partnership. The Defendants each owned fifty percent of the general partner interest in each of the partnerships (transcript 2 at 10). The apartment buildings were operational when they were acquired from the builder, Draper Development Corporation (transcript 2 at 42). Under the terms of the sale, the partnerships assumed various mortgage liabilities of the builder (transcript 3 at 67) and gave back to the builder a $200,000.00 second mortgage (transcript 2 at 44). The testimony indicates that the builder remained personally liable on the assumed mortgages (transcript 3 at 54).

In the middle of 1974, the Defendants took over the management of the partnerships' real estate holdings (transcript 2 at 24). They received a fee of $25,000.00 a year from two of the partnerships for services rendered in managing the properties. The Defendants had a ten percent interest in any profits realized by the third partnership (transcript 2 at 40–41, 55). When the Defendants first took control of the premises the apartment occupancy rate was approximately sixty percent (transcript 2 at 24, transcript 3 at 52). Although occupancy increased after the Defendants began managing the buildings (transcript 2 at 24), it is unclear as to what the actual occupancy rate was during the period of 1974 through 1977 when the Defendants had control of the premises (transcript 3 at 43–44, 115–116). The Defendants have indicated that one of the reasons they filed for bankruptcy was their inability to keep the apartments rented. Mr. Pelletier was in charge of the day to day operations of the business and he devoted a substantial amount of time to the performance of his duties (transcript 2 at 26). Mr. Dickey's responsibilities mainly consisted of arranging for financing for the business (transcript 3 at 37).

During the period in which they managed the property, the Defendants were plagued with various problems including pests, floods, abandonment of apartments by tenants and rising costs of electricity. The Defendants took various steps to conserve energy and reduce the amount of electricity used by the apartment buildings. In addition to caulking windows (transcript 3 at 51–52) and shutting off the power in vacant apartments (transcript 3 at 51), the Defendants added insulation to the buildings (transcript 3 at 105) and had the roof of at least one building repaired (transcript 3 at 51). Despite the emphasis on conservation and some increase in apartment occupancy, the financial situation of the business deteriorated.

---

1. § 17(a)(2) of the Bankruptcy Act states in relevant part, "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as ... are liabilities for obtaining money or property by false pretenses or false representations..."

On January 15, 1977, the Defendants signed a contract which relieved them of their managerial responsibilities and allowed Brokers Diversified, Incorporated to assume the duty of managing the apartment complex (transcript 2 at 36). The Defendants, however, retained their status as General Partners (transcript 2 at 35).

At approximately one o'clock in the morning on February 14, 1977, an employee of the Plaintiff received a report that someone was tampering with an electric meter that serviced one of the apartment buildings managed by the Defendants (transcript 1 at 10). The report indicated that the person who did the tampering wore a yellow hardhat. It has been determined that Plaintiff's employees wear yellow hardhats (transcript 1 at 44). Over the next several days, two of the Plaintiff's employees inspected all five of the electric meters that had been installed at the apartment complex. Their investigation revealed that all of the seals that were used to protect and safeguard the meters had been cut or broken (transcript 3 at 70–74). These seals were designed so that they could only be removed if they were broken (transcript 1 at 13). The seals on the meters in question had been reset so that it would appear that they had not been cut (transcript 1 at 15). The five meters were eventually removed from the premises and shipped to the Plaintiff's meter test center where they were examined for further evidence of tampering (transcript 1 at 28). After a thorough examination of the meters at the test center it was determined that additional tampering had occurred.

Attached to every meter is a device known as a "ten pole test switch". The purpose of which is to insure the safety of the individuals who maintain and repair the meter (transcript 1 at 16). There are three metal switches on these devices that control the amount of electricity that flows through the meter. A workman repairing a meter could open these switches and thereby reroute the electric current through an avenue other than the meter. This would enable the workman to safely repair the meter without reducing the flow of electric-

ity to the customer (transcript 1 at 18). Opening the switches, however, also prevents the meter from recording the amount of electricity used by the customer (transcript 1 at 19–20). The switches on the five meters removed by the Plaintiff's employees were in the closed position. However, there were copper scratches on the switches indicating that they had previously been opened (transcript 1 at 25). The evidence does not establish how many times the switches were opened or when they were opened (transcript 1 at 48). The switches are never checked or opened after the initial installation of the meter unless the meter is in need of repair (transcript 1 at 62). Between 1972 and 1977, the Plaintiff's maintenance department did not receive any reports indicating that the meters in question had been tampered with or damaged (transcript 1 at 50, 60). Nevertheless, during the Defendant's term as managers of the property, some of the meters were damaged and repaired (transcript 2 at 51, transcript 3 at 109). Although the Plaintiff's meter readers were instructed to report any damage to the meters they examined, no damage reports were ever submitted to the Plaintiff's maintenance department concerning the meters on the partnerships' premises. Analysis at the meter test center also uncovered evidence of additional tampering with at least four of the meters removed from the apartment complex (transcript 3 at 90–95). However, it was impossible to determine at what point in time such tampering took place.

After examining the meters at the test center, one of the Plaintiff's employees performed a complex analysis to determine whether the amount of electricity registered by the meters over the previous four years varied from the amount of electricity that the apartments should have consumed over that period. This analysis allegedly proved that the amount of electricity used during the years 1975 and 1976 was approximately twenty-five percent less than the amount that should have been used (transcript 2 at 82). This twenty-five percent difference was translated into a $78,993.99

loss to the Plaintiff, which is the sum Plaintiff is seeking to have declared nondischargeable. In calculating the amount of electricity that should have been consumed by the properties over the time period in question, a number of variables were considered. At least one of these variables, the number of occupied apartments, was based upon an estimation by the Plaintiff's employee. An estimated ninety percent occupancy rate was a factor used in the formula (transcript 3 at 3, 10, 16). The employee who performed the analysis admitted that the level of occupancy would make a difference in the amount of electricity that should have been consumed. Since the occupancy level was an estimate, the amount of electricity that should have been used was also an estimate (transcript 3 at 26). Therefore, the amount of damages claimed by the Plaintiff is an estimate as well (transcript 3 at 19).

■ Although a claim based upon willful and malicious conversion of the property of another might have been more appropriate, given the above facts, the Plaintiff has characterized its cause of action as one seeking relief from fraud. In any event, the Plaintiff has the burden of proving that the debt is nondischargeable under § 17(a)(2) of the Bankruptcy Act. *In re Nance*, 556 F.2d 602 (1st Cir. 1977). Such proof must be clear and convincing. *In re Liberati*, 11 B.R. 54 (Bkrtcy., E.D.Pa.1981); *In re Koushel*, 11 B.R. 836 (Bkrtcy., E.D.Va. 1981); *In re Walker*, 7 B.R. 216 (Bkrtcy., D.R.I.1980); *Matter of Lawrence*, 1 B.R. 402 (Bkrtcy., S.D.N.Y.1979); *In re Huff*, 1 B.R. 354 (Bkrtcy., N.D.Utah 1979). Positive fraud must be found for a debt to be nondischargeable pursuant to § 17(a)(2).

'It must...affirmatively appear that [the] representations were knowingly and fraudulently made, and that they were relied upon by the other party.' IA Collier on Bankruptcy ¶ 17.16 at 1635–36. In addition, a fraudulent intent to deceive is generally required. *In re Houtman*, 568 F.2d 651, 655 (9th Cir. 1978) (debtor, among other things, must have made the representations at the time knowing they were false, with the intention and purpose of deceiving the creditor). *Commonwealth of Massachusetts v. Hale*, 618 F.2d 143, 147 (1st Cir. 1980).

■ The Plaintiff has clearly proven that the meter seals were broken and that the meters and test switches were adjusted. However, there is no direct evidence to support Plaintiff's contention that the Defendants, their agents or employees tampered with the equipment. Consequently, in order to meet its burden of proof, the Plaintiff has marshalled what circumstantial evidence exists in support of its claim. The facts indicate that the Defendants managed the premises, where the alleged diversions took place, from the middle of 1974 until February 15, 1977. On February 14, 1977, the day before the Defendants were relieved as managers, an unidentified man was seen "messing" with a meter. He wore a hat the same color as those worn by the Plaintiff's employees. With the exception of this one incident, it is impossible to ascertain when the alleged tamperings took place or to determine the identity of the culprit. It is possible that prior owners or managers of the property or subsequent managers or indeed anyone with any interest in the business could have adjusted the meters. Plaintiff argues that a diversion took place during the years 1975 and 1976, when Defendants were in control of the property, because during that period less electricity was used than should have been used. However, Plaintiff's calculation of how much electricity should have been used is based upon an estimated occupancy rate at a time when the occupancy rate fluctuated considerably and does not take into account the Defendants' efforts to conserve electricity. During 1975 and 1976, the Plaintiff's meter readers never submitted reports of tampering or damage to the meters in question. Nor does the Plaintiff have any record of such damage, even though the evidence indicates that at least one meter was damaged by a vehicle and later repaired by Plaintiff's employees. Apart from the problem of valuation of the debt, the Plaintiff has not provided substantial proof linking the Defendants to the

alleged tampering. The Plaintiff, therefore, has not presented clear and convincing evidence of fraud or willfull and malicious conversion of property that is necessary to support a finding of nondischargeability under § 17(a)(2).

Accordingly, the debt is determined to be discharged in bankruptcy.