In re Ronald D. SAYPOL, Debtor.

**BARCLAYS BANK OF NEW YORK, N.A., Plaintiff,**

v.

**Ronald D. SAYPOL, Defendant.**

**MARINE MIDLAND BANK, N.A., Plaintiff,**

v.

**Ronald D. SAYPOL, Defendant.**

**Bankruptcy No. 83 B 10391(HCB).**
**Adv. Nos. 85–5487A, 83–5609A.**

United States Bankruptcy Court, S.D. New York.

July 5, 1983.

Hawkins, Delafield & Wood, New York City, for plaintiff Barclays Bank of New York, N.A.; Robert M. McCulloch Jr., and Thatcher A. Stone, New York City, of counsel.

Walsh & Frisch, New York City, for plaintiff Marine Midland Bank, N.A.; Jerome K. Walsh, New York City, of counsel.

Chester B. Salomon, P.C., New York City, for debtor; Chester B. Salomon, P.C., and Alec P. Ostrow, New York City, of counsel.

## DECISION ON PROCEEDINGS TO VACATE AUTOMATIC STAY

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Marine Midland Bank, N.A. ("Marine") and Barclays Bank of New York, N.A. ("Barclays") seek a modification of the automatic stay codified in 11 U.S.C. § 362(a) so that they may foreclose on perfected security interests they hold in property of the debtor, Ronald D. Saypol.

### I

Ronald D. Saypol was Chairman and Chief Executive Officer of the Lionel Corporation ("Lionel") until July, 1982. He then took a leave of absence under terms of an agreement contemplating his resignation from all positions he held at Lionel, and, on April 19, 1983, Lionel's Board of Directors authorized the rejection of Saypol's employment contract with Lionel. Saypol does continue to own approximately two percent of the outstanding shares of Lionel common stock.[1] He also remains employed at Dale Electronics, Inc., an 82 percent subsidiary of Lionel, and he serves as a member of Lionel's Board of Directors. On March 15, 1983, Saypol filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. 11 U.S.C. 101 *et seq.* (Supp. V 1981).

---

1. The Lionel Corporation, 1982 Form 10–K, 23 (1983) (annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934). (Hereafter "Form 10–K.")

Marine loaned Saypol $190,000 during the period from July 25, 1980 to September 24, 1980. These loans are secured by 31,714 shares of Lionel common stock. On January 6, 1983, the Supreme Court of the State of New York, County of New York, entered judgment in the amount of $213,080.23 in favor of Marine based on Saypol's failure to pay principal and interest when due.

Similarly, between October 8, 1980 and May 15, 1981, Barclays loaned $395,000 to Saypol. Saypol pledged 75,000 shares of Lionel common stock to secure these loans. When Saypol did not make the payments due on the loans, Barclays sued Saypol. On March 3, 1983 the Supreme Court of the State of New York, County of New York, entered judgment of $459,383.87 in favor of Barclays based on Saypol's failure to pay principal and interest when due.

The parties have stipulated on the record in open court that on March 15, 1983, Lionel common stock traded on the Pacific Stock Exchange at $3\%_{16}$ per share. Record at 16. At that price, the shares held by Marine and Barclays had a value of $101,088.37 and $239,062.50, respectively, leaving Marine undersecured in the amount of $111,991.91 and Barclays undersecured in the amount of $220,321.27.

The parties similarly stipulated that on June 14, 1983, the date of the hearing on this matter, Lionel common stock was trading at $5\%_8$ per share. Record at 12. The shares held as collateral by Marine and Barclays thus had increased in value to $170,462.75 and $384,365, respectively, leaving Marine and Barclays undersecured in the amount of $42,617.53 and $75,018.87, respectively. Notwithstanding this rise in value, Saypol states that "[t]heir is no rational basis for a substantial departure from the current range in the value of the Lionel stock at least until the middle of July, 1983." Defendant's Memorandum of Law at 5. It is undisputed that the shares must trade at $6\%_8$ for there to be no deficiency. Record at 26.

At the hearing held pursuant to Section 362(d) of the Bankruptcy Code, an affidavit of the debtor, together with exhibits, including the 1982 Form 10–K filed by Lionel with the Securities and Exchange Commission, was proferred and, upon the consent of the plaintiffs, was received in accordance with *Semmes Motors Co. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir.1970).

The Lionel 1982 Form 10–K states that Lionel and its consolidated subsidiaries are primarily engaged in the specialty retailing of toys and leisure products and the manufacture and sale of electronics components. On February 19, 1982, Lionel and two of its wholly owned subsidiaries, Lionel Leisure, Inc. and Consolidated Toy Company, filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code. According to the Form 10–K, Lionel in February, 1983 reached an agreement in principle on the financial elements of a plan of reorganization. The plan proposes to provide payment to unsecured creditors of $70 million in cash less certain administrative expenses and priority creditors' claims; $10 million in new 8% preferred stock, convertible into 2 million shares of Lionel common stock; approximately 3.8 million additional shares of Lionel common stock (35 percent of the Lionel's outstanding common stock); and annual installment payments aggregating $45.5 million through 1984. Form 10–K, *supra,* p. 1, note 1, at 3. Concomitantly, Lionel intends to sell its 82 percent interest in Dale Electronics, Inc. for $43 million in cash.

## II

The automatic stay of creditors provided to a debtor upon the filing of a petition in bankruptcy, 11 U.S.C. § 362(a) (Supp. V 1981), has been the subject of heated interest since the initial debates leading to the enactment of this nation's first federal bankruptcy statute in 1841. *See* C. Warren, *Bankruptcy in United States History* 70–79 (1933). Moreover, it has been recognized that the stay of creditors from collecting their claims against a debtor and his property is generally indispensable to the effective administration of proceedings in straight bankruptcy and to a successful reorganization. *See, Mueller v.*

*Nugent,* 184 U.S. 1, 14, 22 S.Ct. 269, 274, 46 L.Ed. 405 (1901); Kennedy, *Automatic Stays Under the New Bankruptcy Law,* 12 U.Mich.J.L.Ref. 1 (1978). By affording a breathing period in which the estate may be reorganized or liquidated, the stay contemplates that the creditors will be treated in an organized and equitable fashion and to that end, prevents creditors from racing to the courthouse seeking to obtain payment of their claims in preference to and to the detriment of other creditors. H.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* 1978 U.S.Code Cong. and Ad. News 5787, 5963, 6297. The imposition of the stay is not to be taken lightly nor to be dismissed cavalierly.

Recognizing the importance that the stay brings to the effective administration of bankruptcy proceedings, Congress retained, in § 362(a) of the Bankruptcy Code, the broad automatic stay of actions that had previously evolved. But Congress, also cognizant of the harm that continuance of the stay could cause to secured creditors, provided in § 362(d) of the Code that:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . .

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if . . . .

**2.** § 361 of the Code provides three examples of adequate protection:

(1) requiring the trustee to make periodic cash payments to such entity [an entity having an interest in property which is required to be 'adequately protected' pursuant to §§ 362, 363 or 365 of 11 U.S.C.] to the extent that the stay under Section 362 of this title, or any grant of a lien under Section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease or grant results in a decrease in the value of such entity's interest in such property; or

(A) the debtor does not have an equity in such property;

and

(B) such property is not necessary to an effective reorganization.

Since it is conceded that the debtor lacks equity in the stock collateralizing the bank's loans, two issues are before this Court:

1. Are the secured creditors adequately protected?

2. Is the stock collateralizing the banks' loans necessary to an effective reorganization?

Pursuant to the provisions of § 362(g), the party opposing relief from the stay, in this case the debtor, has the burden of proof on both of these issues.

### ADEQUATE PROTECTION

#### A. *The Statutory Language*

The Code does not expressly define the term "adequate protection" contained in § 362(d)(1). *In re Monroe Park,* 17 B.R. 934, 937, 6 Collier Bankr.Cas.2d 139, 142 (D.C.D.Del.1982); 2 Collier on Bankruptcy, § 361.01, at 361–3 (15th ed. 1983). It does, however, set forth in § 361 three examples of acceptable means of providing adequate protection and an express prohibition of a means thought previously acceptable.[2] They serve to indicate the contours Congress intended to supply to the term.

■ Turning as we must to the statutory language of not only the section expressly involved[3] but also other integrated provisions,[4] it is clear from the language em-

(3) granting such other relief, other than entitling such entity to compensation allowable under Section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

**3.** *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976).

**4.** *Touche Ross & Co. v. Redington,* 442 U.S. 560, 571, 99 S.Ct. 2479, 2486, 61 L.Ed.2d 82 (1978); *Ernst & Ernst,* 425 U.S. at 201, 96 S.Ct. at 1385; *Blue Chip Stamps v. Manor Drug*

ployed in §§ 361(1) and (2) that "adequate protection" contemplates protecting the secured creditor only from "a decrease in the value of such entity's interest" in the collateral due to the imposition of the stay. This emphasis by Congress on a decline in the value of the collateral, as shown by its repetition of the term when expressly referring to the automatic stay, is fairly conclusive. In the context of the automatic stay, Congress believed the existence *vel non* of such a decline to be almost decisive in determining the need for adequate protection.

■ It is only with respect to § 361(3) that it can be said that Congress may have intended an additional concept: "the realization by such entity of the indubitable equivalent of such entity's interest in such property." But this section is to be interpreted in light of and with the guidance of other provisions of the Code,[5] particularly § 506. *In re South Village, Inc.,* 25 B.R. 987, 989, 997, 9 Bankr.Ct.D. 1332, 1333, 1338 (Bkrtcy.D.Utah 1982); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 828, 8 Bankr.Ct.D. 1402, 1407, 6 Collier Bankr. Cas.2d 713, 723 (Bkrtcy.S.D.N.Y.1982); *contra In re American Mariner Industries, Inc.,* 27 B.R. 1004, 1009 (Bkrtcy.App.Cal.1983).

Typically, a secured creditor's contractual interest in collateral lies in its value to secure the payment of principal and interest and in the creditor's ability to foreclose upon default, thereby enabling it to lend or invest the proceeds elsewhere. Section 506, however, limits a secured claim to "the extent of the value of such creditor's interest in the estate's interest in such property." 11 U.S.C. § 506(a) (Supp.V.1981). It allows interest only to the extent that the value of the creditor's interest exceeds the claim and it provides, in the case of a deficiency, that the amount of the claim exceeding such value shall be allowed as an unsecured claim. Under § 506, interest does not accrue to a secured creditor on its claim merely because of the imposition of the stay barring foreclosure. Rather, the accrual of interest is a function of the relationship which the value of the collateral bears to the value of the creditor's claim. If that value is lacking, post petition interest is unsecured and is not allowed. § 502(b)(2). No regard, other than the extent to which § 506(b) permits interest to accrue to the extent permitted by the value of the collateral is given to the secured creditor's temporary loss of its ability to foreclose and to use its funds due to the imposition of the stay.

■ The language of the statute thus persuasively indicates that the concept of adequate protection is delineated by concern for protection of the secured creditor from decrease in the value of the collateral securing its claim. That the secured creditor may, in a deficiency situation, receive no interest reflecting the loss of the use of its funds while stayed from foreclosure results not from the imposition of the stay, but from the inadequacy of the collateral bargained for by the secured creditor.

Although the statute is plain enough and further inquiry is thus unnecessary, *United States v. Campos-Serrano,* 404 U.S. 293, 298–299, 92 S.Ct. 471, 474–475, 30 L.Ed.2d 457 (1971); *United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961), we turn, nevertheless, to examine whether any contrary intention forcefully appears from the legislative history. *Ernst & Ernst,* 425 U.S. at 201, 96 S.Ct. at 1385.

B. *The Legislative History*

■ No such intention, however, appears. Instead, the legislative history confirms that adequate protection centers on protection of a secured creditor from suffering a decline in the value of the collateral during the bankruptcy proceeding. As such, it is "interim protection, designed not as a purgative of all creditor ailments, but as a palliative of the worst: reorganization, dismissal or liquidation will provide the final relief." *In re Alyucan Interstate Corp.,* 12

*Stores,* 421 U.S. 723, 734, 95 S.Ct. 1917, 1925, 44 L.Ed.2d 539 (1975).

5. *See* n. 4, *supra.*

B.R. 803, 806, 7 Bankr.Ct.D. 1123, 1124, 4 Collier Bankr.Cas.2d 1066, 1068 (Bkrtcy.D. Utah 1981).

Briefly, the Commission on the Bankruptcy Laws of the United States, giving impetus and direction to the legislative process culminating in the Code, described the concept in terms of "the anticipated decrease in the value of the collateral as the result of use." Report of the Commission on the Bankruptcy Laws of the United States, H.Doc. No. 93–137, pt. II, at 237 (1973). The testimony of witnesses representing the American Bankers Association and commercial lenders focused on their need for exactly such protection. *South Village*, 25 B.R. at 992–993, nn. 5–6, 9 Bankr.Ct.D. at 1335–36. The House and Senate committee reports confirmed that emphasis. Some witnesses emphasized the need of a marginally secured creditor to recover the cost of losing the opportunity to reinvest its funds upon being stayed from foreclosure, *id.* at 994, n. 8, 9, Bankr.Ct.D. at 1337. The cases under the Bankruptcy Act were divided on whether secured creditors were entitled to relief because of the cost of such lost opportunity.[6] The House and Senate reports, however, fail to reflect that Congress, notwithstanding having been presented with the issue, had any intention of adopting such a proposal. Instead, they affirm that Congress focused on protecting the secured creditors' interest in the value of the collateral.

For example, the discussion by each house of §§ 361(1) and (2) tracks the statutory language in its emphasis on declining value. S.Rep. No. 989, 95th Cong.2d Sess. 53, (1978) *reprinted* in 1978 U.S.Code Cong. & Ad. News 5787, 5839; H.Rep. No. 575, 95th Cong., 1st Sess. 338–39 (1977), *reprinted* in 1978 U.S.Code Cong. & Ad.News 5963, 6295–96. With respect to § 361(3), the House Report affirms that the section was designed to vest the bankruptcy court with flexibility in fashioning various forms of relief to the secured creditor "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." House Report, *supra* at 340, U.S.Code Cong. & Admin. News 1978, p. 6296. It thus makes clear that the relief contemplated by Congress is that which "will result in the realization by the [secured creditor] of the value of its interest in the property involved." House Report, *supra* at 340, U.S.Code Cong. & Admin.News 1978, p. 6296.

That the Act reported out by the House was amended at conference of the House and Senate to substitute the term "indubitable equivalent" for "value" does not alter this conclusion. *See* Legislative History of The Bankruptcy Act, 1978, Comparison of H.R. 8200 and S. 2266 at 53–54. ("Legislative History") A compromise amendment may, in appropriate circumstances, have particular force in construing a statute, but here the plain language of Section 506 controls and the legislative history pertaining to the amendment is especially sparse, not even indicating any significance to the change.

The most that can be said, therefore, in support of attaching significance to the amendment is that the term "indubitable equivalent" has its origin in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935). There, in focusing on a proposed plan that would have required a secured creditor to forego amortization for ten years and to accept interest in the interim, Judge Learned Hand, writing for the Second Circuit, held that § 216(7)(d) of the Bankruptcy Act required more: He stated:

"adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to

---

6. *Compare In re Penn Central Transportation Co.*, 474 F.2d 832 (3d Cir.1973), *In re Holiday Lodge, Inc.*, 300 F.2d 516 (7th Cir.1962) (awarding relief) *with In re Investors Funding Corp.*, 592 F.2d 134 (2d Cir.1979), *In re Castle Village Co.*, 3 Bankr.Ct.D. 588 (S.D.N.Y.1977) (denying relief).

suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*Id.* at 942.

Some courts have seized on this language to reason, largely in *dicta,* that if the secured creditor receives no compensation for his lost opportunity cost, he is not adequately protected and the automatic stay, therefore, should be vacated. *See, In re Monroe Park,* 17 B.R. 934, 6 Collier Bankr.Cas.2d 139 (D.C.D.Del.1982); *In re Virginia Foundry Co.* 9 B.R. 493 (D.C.D.W.Va.1980); *In re Anchorage Boat Sales, Inc.* 4 B.R. 635, 6 Bankr.Ct.D. 495 (Bkrtcy.E.D.N.Y.1980). Others have noted the different context addressed by Judge Hand. *American Mariner* 27 B.R. at 1008; *In re Alyucan Interstate Corp.* 12 B.R. 803, 809, 7 Bankr.Ct.D. 1123, 1126, 4 Collier Bankr.Cas.2d 1066, 1072 (Bkrtcy.D.Utah 1981); *In re Pine Lake Village Apartment Co.* 19 B.R. at 838, 8 Bankr.Ct.D. at 1408, 6 Collier Bankr.Cas.2d at 724.

Where statutes employ "familiar legal expressions in their familiar legal sense," [7] the words employed are to be accorded the meaning long attached to them. *See Ernst & Ernst* 425 U.S. at 214, 96 S.Ct. at 1391. Here, however, a phrase has been transplanted from one context to another. Stretching out payment to a secured creditor over ten years pursuant to a plan in preference to junior interests entails far greater uncertainty than staying a secured creditor from realization of his value in the collateral during the pendency of the proceeding. *See, In re American Mariner Ind., Inc.* 10 B.R. 711, 712, 7 Bankr.Ct.D. 614, 615, 4 Collier Bankr.Cas.2d 642, 643 (Bkrtcy.D. Cal.1981) aff'd. 27 B.R. 1004 (Bkrtcy.App. Cal.1983); *Pine Lake,* 19 B.R. at 819, 8 Bankr.Ct.D. at 1403, 6 Collier Bankr.Cas.2d 713. Plucking a word from one source does not require that the old garden with its various shades of meaning be transplanted entirely to the different context.

More telling is the structure of the compromise arrived at. As passed by the House, Section 361 would have contained four sections: 361(1) and (2) in the form finally enacted, 361(3) with the term "value" instead of "indubitable equivalent" and a provision permitting the court to award an administrative priority as adequate protection. Legislative History at 53–54. The Senate version contained only §§ 361(1) and (2) with their emphasis on decline in value. *Ibid.* It would be totally contrary to this history to reason that the House, in yielding to the Senate, had substituted "indubitable equivalent" for "value" and thereby added a provision significantly broader than the decline in value test originally passed by the Senate. It seems closer to the mark to reason that the terms were substantively interchangeable and "indubitable equivalent" added only to affirm that the court should address, in an appropriate case, the uncertainty stated by Judge Hand rather than the cost of a lost opportunity to invest.

It thus appears that the term "indubitable equivalent" was added merely to afford the court with flexibility to prevent the secured creditor from being unduly harmed by erosion of the value of the collateral during the stay. In any case of statutory interpretation "there is no canon against using common sense in construing laws in saying what they obviously mean." *Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929). Here it makes little, if any, sense to read anything more into "indubitable equivalent" in the adequate protection context of 362(d). Such a reading would far expand the intent manifest in the legislative history and be inconsistent with the scheme for allowance of secured claims.

As applied here it is clear that the banks are adequately protected. The value of the collateral has not decreased since the filing of the petition. Instead, it has increased. That there is a deficiency is not enough.

## PROPERTY NECESSARY FOR AN EFFECTIVE REORGANIZATION

Since the standards for relief contained in § 362(d) are stated in the disjunctive, our

7. *Henry v. United States,* 251 U.S. 393, 395, 40 S.Ct. 185, 186, 64 L.Ed. 322 (1920).

holding that Barclay's and Marine Midland are adequately protected under § 362(d)(1) is not dispositive of this adversary proceeding.

Section 362(d)(2) also provides for relief from a stay against property if the debtor does not have equity in such property and if such property is not necessary to an effective reorganization. Given the conceded lack of equity, the question is whether the Lionel shares held by the banks are necessary to an effective reorganization.

The sum and substance of the debtor's argument on this score is simple: that although there is no equity, it is possible that the stock may rise in value so that it can be sold pursuant to a liquidating plan of reorganization at a price sufficient not only to satisfy the banks but also to provide a return to unsecured creditors.

This position raises an issue not necessary for decision here. Courts have disagreed whether Section 362(d)(2) requires relief from the stay when a liquidating plan is contemplated. *Compare In re Terra Mar Associates,* 3 B.R. 462, 6 Bankr.Ct.D. 150 (Bkrtcy.D.Conn.1980) (showing potential rehabilitation required) *with In re Koopmans,* 22 B.R. 395, 9 Bankr.Ct.D. 514, 6 Collier Bankr.Cas.2d 1414 (Bkrtcy.D.Utah 1982) (liquidation plan held sufficient).

■ Regardless of the resolution of that issue, the courts have required the debtor to show that an effective reorganization is possible and that the property will contribute to it. *Pine Lake,* 19 B.R. 819; *In re Dublin Properties,* 12 B.R. 77, 14 Collier Bankr.Cas.2d 885, (Bkrtcy.E.D.Pa.1981); *In re Terra Mar Associates,* 3 B.R. 462, 6 Bankr.Ct.D. 150 (Bkrtcy.D.Conn.1980). This should not mean, however, that a debtor is required to demonstrate that it has actually proposed a plan of reorganization which is acceptable to its creditors. *Dublin Properties,* 12 B.R. at 8, 4 Collier Cas.2d at 889. The debtor need only prove that there is a reasonable probability that it will be able to propose a plan that will result in a successful reorganization within a reasonable time. *Ibid.; In re Penn York Manufacturing, Inc.,* 14 B.R. 51, 4 Collier Bankr.

Cas.2d 965 (Bkrtcy.M.D.Pa.1981); *Terra Mar* 3 B.R. at 466, 6 Bankr.Ct.D. at 153.

A reasonable probability, however, is not to be grounded solely on speculation. Congress did not require an undersecured creditor to sit idly by solely in reliance on the proposition that the collateral might rise in value sufficient to fund a plan. Indeed, Congress intended that secured creditors not bear the brunt of such speculation of this nature. In § 361(3) Congress expressly barred the court from affording adequate protection by awarding a secured creditor with an administrative priority claim "because such protection is too uncertain to be meaningful." Senate Report No. 989, *supra,* at 54, U.S.Code Cong. & Admin.News 1978, p. 5840.

■ The inherent risks in the stock market are equally uncertain here. The price increase in Lionel stock from 3³⁄₁₆ per share on March 15, 1983 to 5⅝ per share on June 14, 1983 provides little comfort; it is due, the debtor alleges, to the stock market perception of the financial benefits implicit in the plan of reorganization announced by Lionel. (Defendant's brief at 5.) No additional disclosures having market impact will be forthcoming as a result of Lionel's filing its plan, *Ibid.* The conceded lack of any rational basis for the premise that the stock will increase in value sufficient to fund a dividend to unsecured creditors hardly is proof that the stock is necessary for an effective reorganization.

Moreover, the stock lacks any particular attribute contributing either to funding of a liquidation plan or to debtor rehabilitation. Certain assets by their income producing nature, by their relationship to other assets, by the benefits they contribute to the debtor, or, as in the case of a factory, by their very essence, can be recognized as essential to an effective plan. *In re Koopmans,* 22 B.R. at 407, 9 Bankr.Ct.D. at 522, 6 Collier Cas.2d at 1427. Where, however, they have no such attributes, such as the office home of the psychoanalyst in *In re Sulzer,* 2 B.R. 630, 5 Bankr.Ct.D. 1314 (Bkrtcy.S.D.N.Y.1980), they become "per-

**804**

haps convenient but not necessary". *Id.* 2 B.R. at 634. But not even *Koopmans* (relied on by the Debtor in support of his claim that § 362(d)(2) permits a liquidating plan to serve as a basis for retaining the automatic stay) suggests that a mere expectancy of an increase in the value of the collateral is sufficient.

Here no such attributes have been shown. While not determining whether such proof would have been sufficient, we note that there is no claim that the stock will pay dividends, that it might bring a premium if sold with other Lionel stock as a large block or that its ownership by the debtor enables him to remain in a high salaried position the income from which could support deferred payments to his creditors. On the contrary, Lionel's proposed Plan of Arrangement would dilute the stock and the Lionel Board of Directors has rejected the debtor's employment contract.

We hold, therefore, that, although the banks are adequately protected, the automatic stay provided by Section 362(a) of the Code must be vacated in favor of the banks pursuant to Section 362(d)(2) of the Code since the Debtor has no equity in the stock of Lionel Corporation held by the banks as collateral and that the debtor has failed to sustain his burden of proof in claiming that such stock is necessary to an effective plan of reorganization.

The foregoing constitutes this Court's findings of fact and conclusions of law in accordance with the Rule of Bankruptcy Procedure 752(a). Settle order on notice. No costs.