**In re DOMESTIC FUEL CORP., Debtor.**

**Bankruptcy No. 87 B 20004.**

United States Bankruptcy Court, S.D. New York.

Feb. 24, 1987.

See also, Bkrtcy., 71 B.R. 734.

Aronwald & Pykett, White Plains, N.Y., for Angelo P. Rainaldi.

Sitomer & Odesser, P.C., New York City, Corporate & Litigation Attys. for debtor.

Marc Stuart Goldberg, P.C., New York City, for debtor.

DECISION ON ORDER TO SHOW CAUSE SEEKING ORDER VACATING AUTOMATIC STAY AND DIRECTING TURN OVER OF STOCK

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The plaintiff, Angelo P. Rainaldi, has moved pursuant to Bankruptcy Rule 4001 and 11 U.S.C. § 362(d) for an order vacating the automatic stay imposed under 11 U.S.C. § 362(a) and directing Marine Mid-

land Bank to turn over to him the shares of stock which it now holds in two wholly owned subsidiary corporations of this Chapter 11 debtor, Domestic Fuel Corp. The two subsidiaries are Henry F. Raab, Inc., a New York corporation, which is also a Chapter 11 debtor in this court and Henry F. Raab Connecticut, Inc., a Connecticut corporation, which is not a Chapter 11 debtor (the "Raab Corporations" or "Raab"). Alternatively, the plaintiff seeks adequate protection for his claimed secured interest in the shares of the two Raab corporations.

The debtor opposes the plaintiff's motion on the grounds that the plaintiff's interest in the stock of the two Raab corporations is not secured and that, in any event, the plaintiff's interest in the stock is adequately protected.

### FINDINGS OF FACT

1. On January 6, 1987, Domestic Fuel Corp., a New York corporation, and Henry F. Raab, Inc., a wholly-owned New York subsidiary corporation of Domestic Fuel Corp., filed with this court separate petitions for reorganization under Chapter 11 of the Bankruptcy Code. Both corporations continued in possession of their assets and managed their business in accordance with 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code.

2. On August 15, 1985, the plaintiff, Angelo P. Rainaldi, sold to the debtor, Domestic Fuel Corp. ("Domestic") all of his interest in Henry F. Raab, Inc. of New York and Henry F. Raab Connecticut, Inc. (collectively referred to as "Raab"). From 1977 to August 15, 1985, the plaintiff had been the chief operating officer and sole shareholder of both Raab corporations.

3. The written stock purchase agreement between the plaintiff and the debtor, Domestic Fuel Corp., dated June 25, 1985 (Exhibit 1) recited that the plaintiff owned 9,200 shares of the New York Raab corporation and 100 shares of the Connecticut Raab corporation, which he agreed to sell to Domestic Fuel Corp. for $1,500,000 and $100,000 respectively, for a total of $1,600,-000. In exchange for the Raab stock the debtor, Domestic Fuel Corp., agreed to pay to the plaintiff at the closing two certified checks, one for $590,000 and one for $10,-000, for a total of $600,000. The balance of the purchase price, amounting to $1,000,-000, was to be paid in 120 equal monthly principal payments, with interest at prime paid monthly on the unpaid balances.

4. As security for the payment of the unpaid part of the purchase price, the agreement provides that the plaintiff is to have a lien upon the Raab stock and, at the closing, Domestic Fuel Corp. "shall deliver to the Chase Manhattan Bank, hereinafter called the 'Escrow Agent', under terms and provisions of an escrow agreement, the certificates evidencing such shares. The shares purchased by the Buyer shall be transferred on the books of Raab, Inc., and Raab Connecticut, respectively, and new certificates in the name of the Buyer shall be issued. Said shares shall be delivered to the Escrow Agent accompanied by duly executed stock powers." (Exhibit 1).

5. At the closing on August 15, 1985, the plaintiff and the debtor, Domestic Fuel Corp., entered into an escrow agreement (Exhibit 5) which they signed and which substituted Marine Midland Bank of White Plains, New York as the escrow agent instead of Chase Manhattan Bank, as originally designated in the stock purchase agreement dated June 25, 1985. Marine Midland Bank did not sign the escrow agreement which the parties delivered to it at the closing, together with the purchase agreement, the Raab stock and, the endorsed-in-blank stock powers.

6. Marine Midland Bank refused to sign the escrow agreement at the closing. Malcolm C. Whittemore, an assistant vice president of Marine Midland Bank testified that he informed the parties before the closing date that Marine Midland Bank could not act as the escrow agent for the purchase transaction because the bank was a creditor of the debtor. Although the parties were apprised prior to August 15, 1985 that Marine Midland Bank refused to act as the escrow agent for the Raab stock they

failed to select another escrow agent for the closing.

7. The Raab stock certificates endorsed-in-blank and stock powers which the debtor delivered to Mr. Whittemore at the closing were placed in a convenience vault which Marine Midland Bank employed for its own internal use, as distinguished from the safe deposit boxes which are used for public and business purposes. Marine Midland Bank continues to hold the Raab stock certificates and the endorsed-in-blank stock powers because the parties never designated an escrow agent.

8. For purposes of the closing, the Raab shares owned by the plaintiff were transferred on the books of the two Raab corporations and new certificates were issued in the name of the debtor, Domestic Fuel Corp. These certificates were not endorsed. Instead, separate stock powers for 9200 shares and 100 shares of Henry J. Raab, Inc. and Henry F. Raab Connecticut, Inc. were signed in blank by the debtor, Domestic Fuel Corp. (Exhibits 3 and 4). The debtor's attorney asked Marine Midland's assistant vice president, Malcolm C. Whittemore, to hold the Raab shares and the endorsed stock powers with the hope that Marine Midland might reconsider its refusal to act as the escrow agent for the purchase transaction. Apparently, the debtor's attorneys, Logan and Logan, agreed to act as the escrow agent if Marine Midland continued to be unwilling to serve.

9. In a letter dated September 11, 1985, (Exhibit 6) from the debtor's attorneys, Logan and Logan, to Mr. Whittemore, the following was said:

Dear Mr. Whittemore:

RE: Domestic Fuel Corp.—
Henry F. Raab, Inc.—
Marine Midland Bank

This will confirm our telephone conversation of September 10, 1985.

At the time of the above transaction, it was requested that the bank let us know whether it would be willing to act as Escrow Agent and, if so, the costs and fees to be anticipated. If not, our office agreed to act as Escrow Agent.

We understand you have contacted the home office and are awaiting their advice.

Very truly yours,
LOGAN AND LOGAN
s/ William E. Logan
William E. Logan

10. In a handwritten note dated September 17, 1985 and inscribed at the bottom of Exhibit 6, Mr. Whittemore wrote:

Advised Logan that we cannot act as escrow agent. *He will advise where and when we can send stock.*

(Emphasis added).

11. The debtor paid only the interest due under the first three monthly promissory notes which it issued to the plaintiff at the closing on August 15, 1985. The debtor made no payments of principal. The debtor made no further payments to the plaintiff after November 15, 1985.

12. In a letter dated October 8, 1986, the plaintiff advised Marine Midland Bank that he had not received any payments from the debtor since November 15, 1985. (Exhibit 10). On December 31, 1986 the plaintiff's attorneys made demand upon Marine Midland Bank to turn over to them the shares of Raab stock they were holding in the two Raab companies because of the debtor's alleged default with respect to the monthly payments due under the promissory notes which the debtor had given to the plaintiff for the purchase of the Raab stock. (Exhibit 8).

13. The Marine Midland Bank would not turn over the stock to the plaintiff or his attorneys, but said that it was willing to deliver the stock to an escrow agent agreed upon by the parties or in accordance with a court order. This position was expressed in a memorandum to the file dictated by Malcolm C. Whittemore of Marine Midland Bank, wherein he said:

Rainaldi called MCW and informed us he had retained a James Walsh in White Plains as his attorney, and that Walsh was sending us a letter stating that the $1MM PM note was in default and that he would demand that we turn over the

458

stock of Raab pursuant to the purchase agreement. MCW replied that we never had agreed to act as escrow agent and had taken the stock and purchase agreement only in safekeeping until an escrow agent could be found. We attempted on numerous occasions for months after the closing, to contact both attorneys representing the parties at the closing, to send us a jointly signed letter of instruction to send the stock and agreement to an escrow agent but this was never consummated. We would have to receive such a jointly signed letter or an order from a court requiring us to deliver the stock and agreement to a designated party before we could do so. Rainaldi understood.

Discussed this with Pat Grace; we would wait for the demand and draft an appropriate reply.

(Exhibit 7).

## ADEQUATE PROTECTION

14. The Raab stock was pledged by the debtor as collateral to secure the debtor's unpaid obligation under the promissory notes which it issued to the plaintiff in the principal sum of $1,000,000 to cover the balance of the purchase price due with respect to the Raab stock. The plaintiff contends that the value of the Raab stock is diminishing and that his secured claim for $1,000,000 is not adequately protected.

15. The plaintiff, Angelo P. Rainaldi, was fully familiar with the business operations of the Raab corporations, having been the chief operating officer and sole shareholder of the corporations from 1977 until he sold his stock interest to the debtor on August 15, 1985. Thereafter he remained with them as a consultant and was active in seeking business for the Raab companies. He testified that before he sold his interest to the debtor the suppliers to the Raab companies were willing to wait to get paid until after Raab received payment from their contracting jobs. Now the suppliers seek cash in advance, with the result that Raab has difficulty in bidding on large jobs. At one time the companies had 45 employees, including 10 steamfitters, whereas they now employ about 24 people, including 2 steamfitters. In November of 1986, the companies had 4 or 5 steamfitters. The backlog of contracting business is down about forty or fifty percent. The companies are no longer able to take advantage of the 2% discount for prompt payment because they are not extended credit terms. During the years before the sale in 1985, the Raab companies did an average volume of business of approximately four million dollars in gross sales. Their gross sales in 1986 were down to approximately two and one-half million dollars. During the last year the only new equipment purchased by the Raab companies was one new truck; their other trucks are now in poor condition.

16. When originally called to the stand, the debtor's president and sole shareholder, Richard W. Smyth, did not know the amount of the Raab gross receipts for January of 1987. He testified that the fees which were paid to the debtor's attorneys, amounting to $40,000, were paid out of the Raab account rather than from the debtor's account. The debtor's attorneys' fees in connection with its acquisition of the Raab stock, which were $12,500, were also paid out of the Raab account and are not reflected as an obligation on the debtor's books.

17. During the post-petition period both billings and receivables declined substantially, with fewer new contracts compared to the same periods in 1985 and 1986. The debtor's president testified that there was a shift in the direction of Raab's business in the post-petition period with the debtor concentrating almost exclusively on the home repair portion of the business and abandoning construction contracting which formally comprised about 60% of the business.

18. The Chapter 11 petition which Henry F. Raab, Inc., the New York corporation, filed with this court lists total assets of $1,889,352 and $810,000 in total liabilities, of which $410,000 represents a contingent liability to Marine Midland Bank, which is

primarily owed by the debtor, Domestic Fuel Corp. Mr. Smyth testified that Raab guaranteed the obligations of Domestic Fuel Corp. to Marine Midland Bank. Additionally, Marine Midland Bank claims a security interest in all of the equipment, inventory and accounts of Domestic Fuel Corp. and Henry F. Raab, Inc.

19. Richard Smyth further testified that the debtor, Domestic Fuel Corp., owns two parcels of property in Rye, New York upon which Marine Midland holds a mortgage lien of approximately $200,000. There is also another lien against this property for about $7,000. Smyth said that the property is worth about $350,000 and that the debtor was willing to give the plaintiff a security interest in the remaining equity in this property. He also said that the debtor was willing to give the plaintiff a security interest in the Raab assets, subject to the secured claim of Marine Midland and the allowed administration expenses and attorneys' fees in the Raab Chapter 11 case. Smyth conditioned this offer on the debtor's losing its action for rescission of the stock purchase agreement. There was no evidence that the creditors of Domestic Fuel Corp. or Raab would consent to Smyth's proposal. Additionally, Smyth said that he would cause Raab to issue monthly financial statements to the plaintiff.

20. Based upon all of the facts in this case there emerges a picture of a deteriorating financial condition affecting the Raab corporations which adversely impairs the value of the Raab stock which was pledged by the debtor in August of 1985 to secure its indebtedness to the plaintiff. Almost all of the Raab assets have been pledged to Marine Midland Bank to secure its claim against the debtor. The debtor has on various occasions used the Raab account as its source for satisfying obligations of the debtor, with the result that this siphoning off of assets from Raab has diminished the value of the pledged Raab stock. The scope and profitability of the Raab business has dwindled since August of 1985, when its stock was pledged

for the plaintiff's benefit. The offer of additionally encumbered assets of the debtor has a hollow ring in light of the absence of consent on the part of the debtor's unsecured creditors. Moreover, there was insufficient proof to establish that this offer would adequately protect the plaintiff's secured interest.

21. The debtor has failed to sustain its burden of establishing that the plaintiff is adequately protected.

22. According to the testimony of the debtor's president, Richard Smyth, the debtor does not owe the plaintiff the $1,000,000 under the promissory notes it gave in exchange for its purchase of the Raab stock. Therefore, the debtor contends that there is no default in payment of the notes. The debtor currently has pending an adversary proceeding against the plaintiff to rescind the Raab stock purchase on grounds of fraud and misrepresentations regarding the financial status of the Raab businesses. In this adversary proceeding the debtor seeks a return of the purchase price it paid for the Raab stock.

## DISCUSSION

The debtor disputes the plaintiff's claim that he is the holder of a secured claim or lien with respect to the Raab stock. Therefore, the debtor argues that the plaintiff lacks standing to seek relief from the automatic stay because the plaintiff does not have an interest in property which is entitled to adequate protection under 11 U.S.C. § 362(d). The debtor maintains that the plaintiff's lien or security interest in the Raab stock was unperfected on the day that the debtor filed its petition for reorganization under Chapter 11 of the Bankruptcy Code. To this end, the debtor invokes its status as a debtor in possession, which enables it to exercise all of the so-called strong-arm powers of a trustee in bankruptcy under 11 U.S.C. § 544(a), including the rights and remedies of a hypothetical lien creditor on the debtor's property as of the date of the Chapter 11 petition who could avoid any liens against such property

that were unperfected as of the date of the petition.

It is conceded by the plaintiff that he did not file any UCC-1 statements in accordance with Article 9 of the New York Uniform Commercial Code. The plaintiff relies instead on Article 8 of the New York Commercial Code which provides for the transfer of investment securities. New York UCC Section 8-321(3)(a) provides that "no filing is required to perfect the security interest" which attaches under New York UCC Article 8. The perfection of a security interest in a security under Article 8 is governed by Section 8-313(1), in accordance with the following directions in Section 8-321(1):

(1) A security interest in a security is enforceable and can attach only if it is transferred to the secured party or a person designated by him pursuant to a provision of Subsection (1) of Section 8-313.

New York UCC Section 8-313(1) specifies nine specific methods for effecting a transfer of a security interest, as delineated in subsections (a) through (i). The plaintiff relies on two of these subsections to sustain his position that he holds a perfected security interest in the Raab stock, namely subsections 313(1)(a) and (h)(ii).

Section 8-313(1)(a) provides as follows:

§ 8-313. When Transfer to the Purchaser Occurs; Financial Intermediary as Bona Fide Purchaser; "Financial Intermediary"

(1) Transfer of a security or a limited interest (including a security interest) therein to a purchaser occurs only

(a) when he or a person designated by him acquires possession of a certificated security; . . .

The key words are "certificated security" because it is clear Marine Midland Bank was a "person designated" by the plaintiff in the escrow agreement (Exhibit 5) to acquire possession of the Raab stock. That Marine Midland Bank refused to act as escrow agent under the stock purchase agreement, as modified by the escrow agreement, does not detract from the fact that it accepted the Raab stock from the debtor and continues to retain possession of this stock in its convenience vault, subject to written directions signed by the plaintiff and the debtor authorizing delivery to an agreed upon escrow agent.

The phrase "certificated" is also crucial to the application of the second subsection relied upon by the plaintiff, namely Section 8-313(1)(h)(ii) which provides:

(1) Transfer of a security or a limited interest (including a security interest) therein to a purchaser occurs only

(h) with respect to the transfer of a security interest where the transferor has signed a security agreement which contains a description of the security, when a written notification signed by the transferor (which may be a copy of the security agreement) is received by
* * *

(ii) a third person, not a financial intermediary, in possession of the security, *if it is certificated;* . . .

(Emphasis added).

In the instant case, Section 8-313(1)(h)(ii) is specifically applicable to the dispute between the parties because it expressly applies to "the transfer of a security interest", as distinguished from the general application of Section 8-313(1)(a) which refers to the "[t]ransfer of a security . . . to a purchaser." Here, the debtor, as "the transferor", signed a security agreement which contains a description of the securities and which requires the debtor to deliver the securities to a named third person pursuant to the escrow agreement. The security agreement, the escrow agreement, the Raab stock certificates and the stock powers endorsed in blank by the debtor were received at the closing by Marine Midland Bank, which thereby became a "third person . . . in possession of the security . . ." within the meaning of Section 8-313(1)(h)(ii). The main source of controversy is whether or not the plaintiff satisfied the provision under this subsection that the security "is certificated".

A "certificated security" for purposes of Section 8–313(1)(a) and 8–313(1)(h)(ii) is defined as follows:

> § 8–102. Definitions and Index of Definitions
>
> (1) In this Article unless the context otherwise requires
>
> (a) A "certificated security" is a share, participation or other interest in property of or an enterprise of the issuer or is an obligation of the issuer which
>
> (i) is represented by an instrument issued in bearer or registered form;
>
> (ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and
>
> (iii) is either one of a class or series or by its terms is divisible into a class or series of shares, participations, interests or obligations.

The debtor asserts that the plaintiff does not possess a perfected security interest in the Raab shares because they are not certificated securities as defined by New York UCC § 8–102(1)(a). The debtor argues that the Raab shares do not meet the first two elements of the definition; whereas all three elements of the definition are listed in the conjunctive so that in order to qualify as a "certificated security", the Raab shares must meet all three elements of the definition.

## THE FIRST
## ELEMENT—REGISTERED FORM

■ Subsection (1) of the definition of a "certificated security" in Section 8–102(1)(a) requires an "instrument issued in bearer or registered form". Shares of stock are invariably in registered form. 60 N.Y.Jur. Transfers Of Security § 3. A security is in registered form according to Section 8–102(1)(d):

> [W]hen it specifies a person entitled to the security or to the rights it represents and when its transfer may be registered upon books maintained for that purpose by or on behalf of an issuer or the security so states.

In this case, the Raab shares were originally issued to the plaintiff. The plaintiff's sale of his Raab stock was reflected in the stock transfer books of these corporations when he returned his shares for the issuance of new shares in the name of the purchaser, Domestic Fuel Corp., which fact was recorded in the stock transfer books of the Raab corporations. Accordingly, the Raab shares were registered securities.

The debtor maintains that because the Raab shares were not issued in the debtor's name they should have borne a legend which gave notice that the debtor's right to the stock was subject to a security agreement held by the plaintiff and that such agreement should also have been noted on the corporate books of the two Raab companies. Obviously there was no need to register the shares in the plaintiff's name because the plaintiff was a secured party and not the owner of the pledged stock. Similarly, the absence of a legend describing the plaintiff's secured interest in the stock did not prevent the Raab shares from qualifying as securities in "registered form" as defined in Section 8–102(1)(d). The person specified as "entitled to the security or to the rights it represents" within the meaning of this definition is the person in whose name the securities are registered and not a pledgee who has not had the stock transferred on the books of the issuing company. Thus, the plaintiff's unrecorded security interest did not prevent the Raab stock from being regarded as in "registered form" as long as the certificates were issued and registered in the debtor's name.

## THE SECOND ELEMENT—OF A TYPE COMMONLY DEALT IN UPON SECURITIES EXCHANGE OR MARKETS

■ The debtor contends that in order to satisfy the definition of "certificated shares" the securities must be shares of publicly traded corporations because the stock of closely-held corporations, such as the Raab shares in question, are not dealt in upon securities exchanges or dealt in as

a medium for investment. However, the case law and the Practice Commentary accompanying Section 8–102, which was prepared by Professor Carlos L. Israels, conclude that the stock of closely-held corporations may satisfy the requirement in Section 8–102(1)(a)(ii). The Practice Commentary states:

It should be noted also that whether or not there is a market for the particular instrument is not the controlling factor, if the instrument is "of a type commonly dealt in upon securities exchanges or markets" and "by its terms is divisible into a class or series of instruments." Thus a certificate representing 200 shares, being the entire authorized capital stock of a small corporation will meet both criteria and fall within the definition.

The debtor overlooks the fact that certificates of stock in closely-held corporations are instruments "of a type" of securities that may be publicly traded or "dealt in as a medium for investment" so as to fit the definition of a "certificated security" in Section 8–102(1)(a)(ii). Case law supports this conclusion. *Katz v. Abrams,* 549 F.Supp. 668, 671 (E.D.Pa.1982); *Baker v. Gotz,* 387 F.Supp. 1381, 1389–1390 (D.Del. 1975) *aff'd* 523 F.2d 1050 (3d Cir.1975); *In re Sandefer,* 47 B.R. 133, 138 (Bankr.N.D. Ala.1985); *Gross v. Vogel,* 81 A.D.2d 576, 437 N.Y.S.2d 431 (1981); *Pantel v. Becker,* 89 Misc.2d 239, 391 N.Y.S.2d 325 (1977). Accordingly, the debtor's objection that certificates of closely-held corporations may not constitute "certificated shares" within the definition of Section 8–102(1)(a)(ii) is unsupportable.

The concept that a tangible written instrument is what is meant by the term "certificated security" is expressed in Section 8–102(1)(c) in relevant part as follows:

(c) A "security" is either a certificated or an uncertificated security. When a security is certificated the terms "security" and "certificated security" may mean either the intangible interest, the instrument representing that interest or both, as the context requires. A writing which

is a certificated security is governed by this Article and not by Uniform Commercial Code—Commercial Paper even though it also meets the requirements of that Article. This Article does not apply to money. When a certificated security has been retained by or surrendered to the issuer or its transfer agent for reasons other than registration of transfer, other temporary purpose, payment, exchange or acquisition by the issuer, that security shall be treated as an uncertificated security for purposes of this Article.

Simply put, shares of stock in a corporation, representing the owner's interest in the corporation's assets, constitute an intangible property interest of the shareholder, which may be evidenced by a certificate of stock in writing reflecting the contract between a corporation and its shareholder. 60 N.Y.Jur. Transfers of Securities § 5. Therefore, a stock certificate is a tangible written instrument which constitutes a certificated security interest in a corporation's assets within the meaning of Section 8–102(1)(a), as distinguished from a share of stock, which is an intangible property interest of a shareholder, and which will be treated as an uncertificated security interest in a corporation unless and until a stock certificate is issued to evidence such interest.

The debtor's strained arguments in support of its position that the Raab shares are not "certificated" securities within the meaning of Section 8–102(1)(a) and as required by Section 8–313(1)(h)(ii) are unpersuasive and not legally correct.

### THE AUTOMATIC STAY

■ Having determined that the plaintiff holds a perfected secured interest in the Raab stock, consideration must be given as to whether or not the plaintiff is entitled to relief from the automatic stay imposed by 11 U.S.C. § 362(a). In any hearing under 11 U.S.C. § 362(d) for such relief, the debtor, as the party opposing relief from the automatic stay, has the burden of proof pursuant to 11 U.S.C. § 362(g)(2) on all

issues other than on the issue of the debtor's equity in the property. Thus, where the plaintiff seeks to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(1) for cause, including the lack of adequate protection of the plaintiff's interest in the collateral in question, the debtor must prove facts sufficient to deny the plaintiff's request for relief.

In this case the debtor has failed to sustain its burden of proof. The facts reveal that after the debtor pledged the Raab stock in August of 1985 to secure its obligation to the plaintiff for the purchase price of the stock, the value of these securities decreased as a result of the progressively deteriorating financial condition of the Raab corporations. Marine Midland Bank holds a security interest in practically all of the debtor's and Raab's assets to secure its claim against the debtor, which was guaranteed by Raab. Money belonging to Raab was siphoned off to satisfy obligations of the debtor. The magnitude of the Raab business substantially decreased after the debtor acquired all of the Raab stock. The decrease was even more precipitous in the post-petition period. The debtor has offered no credible evidence to refute this bleak picture, which constitutes sufficient cause for determining that the plaintiff's interest in the Raab securities is not adequately protected.

This court had previously said that "a secured creditor has the right to receive adequate protection for any decline in value the collateral may suffer after the automatic stay is in effect, since but for the stay, the creditor could foreclose to prevent or mitigate any loss in the value of the security." *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 825, 8 B.C.D. 1402, 1406, 6 C.B.C.2d 713, 721 (Bankr.S.D.N.Y. 1982). As stated in *In re Beker Industries Corp.*, 58 B.R. 725, 736 (Bankr.S.D.N.Y. 1986) the "focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Similarly, in *Barclays Bank of New York v. Saypol (In re Saypol)*, 31 B.R. 796, 800, 10 B.C.D. 1057, 1059 (Bankr. S.D.N.Y.1983), the court said that "[t]his

emphasis by Congress on a decline in the value of the collateral, as shown by its repetition of the term when expressly referring to the automatic stay, is fairly conclusive. In the context of the automatic stay, Congress believed the existence *vel non* of such a decline to be almost decisive in determining the need for adequate protection." In the instant case, the deteriorating financial condition of the Raab corporations since the debtor's acquisition of their stock in August of 1985 has resulted in a consequential decline in the value of their stock which was pledged by the debtor to secure its $1,000,000 obligation to the plaintiff. The sharply lower receivables and billings for the two-month period after the filing when coupled with a radical change in the business of the debtor converted the decline into a sharp drop. The debtor has not established that it has offered adequate protection to the plaintiff to compensate for this decline in the value of the collateral.

In light of the foregoing, the plaintiff is entitled to be relieved from the automatic stay imposed by 11 U.S.C. § 362(a) so that he may pursue his legal remedies to recover possession of the Raab stock. However, the plaintiff's additional request for an order directing Marine Midland Bank to turn over the Raab stock to him cannot be entertained under this motion because a turnover claim must be asserted in an adversary proceeding according to Bankruptcy Rule 7001(1). The debtor has denied the existence of a default under the promissory notes given to the plaintiff for its acquisition of the Raab stock on the ground that there is no existing obligation because the purchase agreement should be rescinded for fraud on the part of the plaintiff. Therefore, a turnover order from this court must first await a determination of the debtor's pending adversary proceeding, where the debtor's rights with respect to the Raab stock may be determined.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28

**464**

U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

2. The plaintiff has established that a transfer of a security interest in the Raab stock occurred on August 15, 1985, within the meaning of New York UCC § 8–313(1)(h)(ii), when the debtor, as transferor, delivered a security agreement which it signed and which contained a description of the Raab stock, to Marine Midland Bank, a third person, which was in possession of the Raab stock, and that such stock constituted a "certificated security" within the meaning of New York UCC § 8–102(1)(a).

3. The transfer of the Raab stock by the debtor on August 15, 1985, to Marine Midland Bank in accordance with the conditions delineated under New York UCC § 8–313(1)(h)(ii) constituted a perfection of the plaintiff's security interest in such stock in accordance with New York UCC § 8–321(1) and no filing was required to perfect the security interest, as declared under subsection (3)(a) thereof.

4. The debtor has failed to sustain its burden of proof imposed by 11 U.S.C. § 362(g)(2) to establish that the plaintiff's security interest is adequately protected.

5. The plaintiff is entitled to relief from the automatic stay for cause, as authorized under 11 U.S.C. § 362(d)(1), because of the decline in the value of the Raab stock and the debtor's failure to prove that it offered adequate protection to the plaintiff to compensate for this decline in value.

SETTLE ORDER on notice.