**In the Matter of Frederick William LAWRENCE a/k/a Fred Lawrence, Debtor.**

**Bankruptcy No. 79 B 1529.**

United States Bankruptcy Court, S. D. New York.

Dec. 4, 1979.

Joseph B. Hirschfield, White Plains, N. Y., for plaintiffs.

Jules Teitelbaum, P.C., New York City, for debtor; Wanda Borges Kiratzopoulos, New York City, of counsel.

## DECISION ON COMPLAINT OF MARIO COPPA AND JOSEPH COPPA TO HAVE DEBT DUE THEM DECLARED NONDISCHARGEABLE

HOWARD SCHWARTZBERG, Bankruptcy Judge.

This is a case involving infertile worms or, more appropriately, the worms that didn't turn. The plaintiffs charged the debtor with having fraudulently induced them to buy worms on the representation the worms would double themselves every three months and that the debtor's corporation would then buy them back, enabling the plaintiffs to earn from $12,000 to $14,000 a year. The debtor's answer denies the allegations and in effect states that the plaintiffs' case is merely a can of worms. The plaintiffs bottom their case on a default judgment obtained against the debtor and his corporation in the sum of $3415.78 entered in the Supreme Court, County of Westchester.

The matter came on for trial at which time evidence was adduced, resulting in the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. The debtor, Frederick William Lawrence, filed a Chapter XIII Wage Earner's Plan on August 24, 1979.

2. At all times hereinafter mentioned the debtor was President of Northern Home Growers Worm Exchange, Ltd., a New York corporation. The plaintiffs, who are brothers, are residents of the State of New Jersey.

3. On or about June 10, 1978, plaintiffs answered a newspaper advertisement placed by Northern Home Growers Worm Exchange, Ltd. [hereinafter called "Northern"]. According to the testimony of plaintiff, Joseph Coppa, the advertisement stated that it was possible to earn $12,000 to $14,000 a year by working one and one-half hours per day raising worms and that Northern would purchase all of the worms raised in accordance with instructions furnished by Northern.

4. Northern responded to plaintiffs' inquiry by sending their sales representative, a Mr. McDonald, to visit with the plaintiffs and to give them details of the proposed work in the growing operation. Mr. McDonald reiterated what was said in the ad, namely, that the plaintiffs could earn between $12,000 and $14,000 a year by raising worms which would be repurchased by Northern and that the worms would multiply 100% every three months.

5. The plaintiffs received a written contract from Northern signed by the debtor, Frederick William Lawrence, as President, pursuant to which Northern agreed to purchase all qualified worms grown by the plaintiffs beyond a maximum quota of 2000 pounds per year. The purchase price was described as "the firm market price." Payment by Northern was to be made within one business week after the sale.

6. On or about June 15, 1978 the plaintiffs received from Northern a supply of worms. They did not receive at this time any instructions, a hand lift or a soil testing kit, all of which were supposed to be furnished pursuant to the agreement. After a number of calls they finally received these items approximately six months after the delay. The soil testing kit was essential to the operation of the business because the quality and number of worms to be grown depended upon proper soil and water content.

7. In November, 1978, the plaintiffs wanted Northern to purchase their supply of worms, but were informed instead by the debtor that they should hold on to the supply until the Spring because Northern was in the process of obtaining a large warehouse and that they were in no position to purchase the plaintiffs' worms.

8. At various times plaintiffs complained to the debtor that the worms were not multiplying at the rate promised and that they had less than half the number of worms they expected. The debtor questioned whether or not the plaintiffs were following the instructions furnished by Northern and that they should continue to keep trying. In effect, the debtor reaffirmed the representations made by the sales representative, Mr. McDonald, that the worms would double in number every three months and that they should be able to earn $12,000 to $14,000 a year at this business. The debtor advised the plaintiffs that they should give this matter a little more time. Although, the debtor repeated that the plaintiffs should feed the worms and water and turn the soil, they nevertheless were unable to double the number of worms grown every three months.

9. The plaintiffs received a letter from Northern, signed by the debtor, as President, advising them that Northern had entered into a settlement with the Attorney General of New York State pursuant to which the debtor was barred from the securities industry in New York because he failed to register the interests he sold in earthworm growing kits as securities. He further advised that as part of the settlement, he offered to make restitution for all monies spent in investing in Northern's home growing work kits, provided that demand for payment was received by the debtor within thirty days. The plaintiffs demanded a return of their payment and never received restitution from either Northern or the debtor.

10. By a complaint, dated February 22, 1979, the plaintiffs sued Northern and the defendant on the ground that they were induced by false representations to enter into the contract with Northern and on the further ground of breach of contract. A default judgment was entered against Northern and the debtor in the New York State Supreme Court, Westchester County in the sum of $3547.50, no part of which has been paid.

11. At no time prior to June 15, 1978, when the plaintiffs entered into their agreement with Northern, did they have any conversations with the debtor. All of the conversations with the debtor occurred after the contract in question. Assuming that the debtor is regarded as having adopted the representations made by Northern's salesman, Mr. McDonald, and assuming that the defendant is regarded as having adopted the representations made by Northern in its advertising, there is nevertheless no proof of any preconceived or undisclosed intention on the part of Northern or the debtor not to perform under the contract and not to repurchase the worms as promised.

12. There was no proof that the worms in question were so infertile as to be incapable of reproducing themselves every three months.

13. At most it appears that Northern promised a performance that was ultimately not attained. This court cannot indulge in inferences to arrive at the conclusion requested by the plaintiffs that Northern never intended to perform under its agreement with them and that the debtor, as its President, acquiesced in deceiving them.

14. The most that can be said for the transaction in question is that the venture did not turn out to be as rose-colored as the optimistic plaintiffs had hoped. Disappointed hopes are not the basis for fraud.

## DISCUSSION

 Although the debtor's liability to the plaintiff is fixed as the result of a default judgment obtained against him in the state court, this court can nevertheless look behind the judgment in order to determine whether the debtor in fact committed deceit or fraud within the meaning of Section 17(a)(2) of the Bankruptcy Act. See *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 [1979].

The objecting creditor had to prove representation, falsity, scienter, deception and injury. *Reno v. Bull,* 226 N.Y. 546, 124 N.E. 144. Such proof must be clear and convincing and the inference of fraud unequivocal. *Bernheimer v. Rindskopf,* 116 N.Y. 428, 22 N.E. 1074; *Manchel v. Kasdan,* 286 App.Div. 483, 144 N.Y.S.2d 694, aff'd 1 N.Y.2d 734, 151 N.Y.S.2d 940. As stated by the New York Court of Appeals in *Bernheimer v. Rindskopf,* supra, 116 N.Y. at page 436, 22 N.E. at page 1075:

"Fraud cannot be presumed. It must be proven, and if there is left room for the inference of an honest intent, the proof of fraud is wanting."

Not every promise as to what will be done in the future can form the basis for a claim of fraud, since a mere promise without a preconceived and undisclosed intention of not performing it only gives rise to an action for a breach of contract. *Adams v. Clark,* 239 N.Y. 403, 410, 146 N.E. 642. See 1A *Collier on Bankruptcy,* ¶ 17.16 at pp. 1638, 1639.

Accordingly, even if the debtor can be held personally liable for the representations made by Northern and its salesman, such representations have not been found to have been deceitful. The plaintiffs have failed to establish that Northern and the debtor never intended to repurchase their worms and never expected that the worms were capable of doubling in number every three months. The fertility of the worms and the amount plaintiffs might earn in growing them appear to be no more than advertising statements upon which the plaintiffs should not have reasonably relied without further investigation.

## CONCLUSIONS OF LAW

1. The plaintiffs have failed to prove that the debtor deceived them and fraudulently induced them to enter into a contract with Northern Home Growers Worm Exchange, Ltd., which neither the debtor or Northern intended to perform.

2. The complaint must be dismissed because the plaintiffs failed to sustain their burden of proving that the debtor's conduct was fraudulent.

3. Accordingly, the plaintiffs have failed to establish that the debtor's liability to them is based upon nondischargeable conduct within the meaning of Section 17(a)(2) of the Bankruptcy Act.