In re DOMESTIC FUEL CORP. and Henry F. Raab, Inc., Debtors.

DOMESTIC FUEL CORP., Plaintiff,

v.

MARINE MIDLAND BANK, N.A. and Angelo Rainaldi, Defendants,

Philip Rainaldi and A & P Rainaldi, Inc., Additional Defendants.

DOMESTIC FUEL CORP., Plaintiff,

v.

Angelo RAINALDI, Defendant.

Bankruptcy Nos. 87 B 20003, 87 B 20004.
Adv. P. Nos. 87 Adv. 6020, 87 Adv. 6002.

United States Bankruptcy Court, S.D. New York.

Oct. 28, 1987.

See also, Bkrtcy., 70 B.R. 455.

Aronwald & Pykett, White Plains, N.Y., for Angelo Rainaldi.

Gary J. Langer, New York City, for debtor.

## DECISION ON MOTION TO RESCIND STOCK PURCHASE AGREEMENT AND CROSS MOTION TO RECLAIM STOCK

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor, Domestic Fuel Corp., has commenced an adversary proceeding against the defendant, Angelo P. Rainaldi, to rescind a stock purchase agreement under which the debtor purchased from Rainaldi all of the stock of Henry F. Raab, Inc. and Henry F. Raab Connecticut, Inc., (collectively referred to as "Raab"), for $1,600,000. Rescission is sought by the debtor on the ground that the stock purchase agreement was entered into as a result of a mutual mistake or as a result of the debtor's mistake and Rainaldi's fraud. Alternatively, the debtor seeks damages in the amount of $1,600,000 because of Rainaldi's alleged breach of warranties.

The defendant, Rainaldi, has counterclaimed for a reclamation of the Raab stock which was pledged by the debtor with Marine Midland Bank to secure the debtor's obligation to Rainaldi under two notes, totalling $1,000,000.00 payable to Rainaldi in equal monthly payments. The debtor has not made payments in accordance with the terms of the notes.

### FINDINGS OF FACT

1. The debtor, is a New York corporation engaged in the business of selling fuel oil for heating purposes and installing heating units. The debtor's president, Richard W. Smyth, is a licensed plumber who has been the head of a plumbing and heating business for many years.

2. On January 5, 1987, the debtor filed with this court a voluntary petition under Chapter 11 of the Bankruptcy Code and continues to operate its business and manage its property interests as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108.

3. The defendant, Angelo P. Rainaldi, is a licensed plumber and was the president and sole shareholder of Henry F. Raab, Inc., a New York corporation and Henry F. Raab Connecticut, Inc., a Connecticut corporation. Both Raab companies were engaged in the business of the installation of heating and air conditioning units for industrial construction projects and for home and business purposes.

4. In the Spring of 1985, Richard W. Smyth, the debtor's president, learned from Angelo P. Rainaldi's brother, Frank Rainaldi, that Angelo was not well and wanted to sell his interest in the Raab companies which he owned and operated. After negotiations between the defendant, Angelo P. Rainaldi and Richard W. Smyth, a purchase price of $1,600,000 was arrived at with respect to the Raab stock, of which $1,500,000 was attributable to Henry F. Raab, Inc. and $100,000 to Henry F. Raab Connecticut, Inc.

5. On June 25, 1985, plaintiff, Domestic Fuel Corp., and the defendant, Angelo P. Rainaldi, entered into a stock purchase agreement which was prepared by Rainaldi's attorney and reviewed by the debtor's attorney. [Ex. # 4]. On July 11, 1985, the parties entered into a Rider "A" which was then annexed to the stock purchase agreement. The agreement provides that Rainaldi would sell 9200 common voting shares of Henry F. Raab, Inc. for the total sum of $1,500,000 and 100 shares of the common voting shares of Henry P. Raab Connecticut, Inc. for the sum of $100,000.

6. Pursuant to the stock purchase agreement the debtor was to pay $600,000 at the closing. The balance of $1,000,000 was to be paid in 120 equal monthly principal payments, with interest at prime paid on the unpaid balances. Each note was to

be endorsed and guaranteed as to payment by Richard W. Smyth.

7. As security for the payment of the unpaid part of the purchase price, Rainaldi was given a lien upon the 9200 common voting shares of Henry F. Raab, Inc. and 100 shares of Henry F. Raab Connecticut, Inc. The shares were ultimately pledged with Marine Midland Bank. In the event of a default under the notes paragraph 17 of the Rider provides that following 45 days after notice given by Rainaldi, he was entitled to demand possession of the pledged Raab stock and to sell them at public or private sale on ten days' notice to the debtor. Rainaldi was given the right to bid and purchase the stock at any such sale.

8. Paragraph 9 of the stock purchase agreement provides that approximately fourteen days prior to the closing, Rainaldi would deliver to the debtor a statement of the assets and liabilities of the Raab companies, including accounts receivable and accounts payable. This paragraph also provides that Rainaldi warrants the accuracy of such statement but does not guarantee the collectibility of the accounts receivable.

9. Paragraph 15 provides that the closing was scheduled to take place during the month of July on a day agreed to between the parties. However, the parties agreed to a delay for the closing and ultimately set August 15, 1985 as the closing date.

10. In paragraph 4 of the Rider, certain amendments are made with respect to paragraph 2 of the stock purchase agreement. The relevant amendments state:

(g) The Seller has delivered to the Buyer Financial Statements of the Corporations for the period January 1, 198 (sic) through December 31, 1984. The Seller represents that the Statements are true and accurate and represent the financial condition of the Corporations as of the respective periods and the results of the Corporations' operations for the fiscal years in question and were prepared in conformity with general accepted accounting principles consistently applied.

.* * * * * *

(j) Since December 31, 1984 there have been no changes in the nature of the business of the Corporations or their financial condition or property other than the changes arising out of the ordinary course of business.

11. Paragraph 5 of the Rider, provides in relevant part as follows:

The obligations of the Buyer are subject, at its option, to the fulfillment on or before the closing date, of each of the following conditions:

(a) There shall be furnished to the Buyer a Certificate executed by the Seller to the effect that the representations and warranties of the Seller contained in this Agreement are true and correct as of the closing date.

12. Prior to the closing, the debtor had complete access to all of the Raab books and records. The debtor's president, Richard W. Smyth, inspected the Raab billings and job requisitions. He spoke to the employees of the Raab companies and visited four job sites where some of Raab's major construction projects were in progress. Rainaldi showed Smyth the Raab accounts receivable records and the printout of accounts payable. Smyth also inspected cost records. Raab did not keep a general ledger. Smyth was given full disclosure as to the figures with respect to Raab's bank balances.

13. The debtor's president, Richard W. Smyth, had his company's accounting firm inspect and review copies of the Raab financial statements for previous years. Rainaldi furnished copies of the Raab financial statements for the years ending December 31, 1980, 1982, 1983 and 1984. (The financial statements for the year 1981 were missing).

14. At the closing on August 15, 1985, Rainaldi informed Smyth of the percentage of completion of the three major pending Raab jobs, namely CTI, Gateway and Pepsico were 99% completed. Rainaldi provided Smyth with Raab statements of assets and liabilities for periods prior to the middle of July, 1985, the originally contemplated closing date. Rainaldi did not pro-

vide Smyth with a statement of assets and liabilities during the period from mid-July 1985 until the actual closing date on August 15, 1985. There was no proof that such statement was ever requested by Smyth or the debtor for any period after mid-July, 1985.

15. Rainaldi discontinued keeping job cost records for the Raab companies after May of 1985 when his daughter, who usually kept these records, left the employ of Raab. Rainaldi told Smyth to have one of the debtor's employees perform this work. Smyth replied he was going to put in a computer instead of having someone like Rainaldi's daughter compile this information. In any event, when Rainaldi informed Smyth at the closing that the Raab business was running smoothly and that the job contracts were 90% plus completed, he based this statement on his thirty years of experience and on "feel", inasmuch as he had discontinued maintaining job cost records after May of 1985.

16. Smyth testified that because he was informed by Rainaldi that the work on Raab's major job projects was mostly completed, he assumed that there would be sufficient receivables due from these jobs for the debtor to collect so as to enable the debtor to apply the job proceeds towards the payment of the money that the debtor borrowed from Marine Midland Bank in order to come up with the $600,000.00 down payment due at the closing on the debtor's purchase of the Raab stock. However, after the closing, the debtor had to perform additional work to complete those major projects with the result that the debtor allegedly expended approximately as much money to complete the job projects as the amounts received under the job contracts. Hence, the cash flow was a wash; no additional funds were available from these major Raab jobs to repay the $600,-000.00 which the debtor borrowed from Marine Midland Bank.

17. The three major Raab jobs which Smyth claims Rainaldi informed him were 99% completed and that the debtor only had to collect the balances due, were CTI, Pepsico and Gateway. Smyth said that the debtor did collect about $600,000 as the balance of the revenues due from all of the Raab jobs, including the three major jobs, but that it cost the debtor approximately $600,000 to complete all Raab's subcontracts after the August 15, 1985 closing. The contract for work on the CTI job amounted to $1,500,000. However, there were subsequent change orders which caused the debtor to expend approximately $45,000 to complete the work after the closing. Thus, the CTI job involved an expenditure of less than 2% of the contract price. Raab's former estimator, Jerome Albert, testified that the CTI job was 97% complete on August 15, 1985. The Gateway contract amounted to approximately $1,100,000. There was no proof as to any additional cost to complete this job. The Pepsico job contract amounted to approximately $1,200,000. However, because of a problem caused by the subcontractor, Honeywell, a $15,000 adjustment was required. Based on the $1,200,000 contract figure, this adjustment amounted to less than 2% of the contract price. Additionally, Smyth testified that Raab no longer received any invitations from Pepsico to bid on any future work. However, he modified this testimony to mean that Raab no longer received bid invitations from Pepsico's Facilities and Maintenance Division, but that Raab did receive invitations to bid from Pepsico's Purchasing department, which is a different Pepsico division. This point is academic because there was no representation by Rainaldi or in the purchase agreement that Raab would continue to receive invitations to bid for any specific job or from any identifiable service.

18. The important point as to the extent of work necessary to complete the Raab jobs pending at the closing date on August 15, 1985, is the fact that Smyth, who was experienced in the plumbing and heating installation business, inspected the Raab job records before the closing. More importantly, he personally visited some of the major job sites before the closing date. Whether Rainaldi told Smyth before the closing that the pending jobs were 90% plus completed, as testified to by Rainaldi, or 99% completed, as testified to by Smyth,

the point is that Smyth was as competent as Rainaldi to project how much additional work was required to complete these jobs. Smyth inspected the figures, spoke to the Raab employees, visited job sites and interrogated Raab employees at the job sites. There was no misrepresentation by Rainaldi as to this issue nor was there a breach of any warranty by Rainaldi as to the extent of completion of the job contracts about which Rainaldi informed Smyth were pending at the date of the closing.

19. The certified statements which Raab issued for the calendar years ending December 31, 1983 and December 31, 1984 were prepared by Raab's certified public accountant, Raymond J. Harting, and were issued on May 23, 1985. [Ex. # 2].

20. On October 31, 1986, Raab's accountant, Raymond J. Harting, issued an uncertified review of the Raab financial balance sheet, statement of income and retained earnings and changes in financial position for the seven and one-half months ending on August 15, 1985, the date of the debtor's stock purchase closing with Rainaldi [Exhibit # 3]. This review was issued fourteen and one-half months after the closing. Harting's covering letter annexed to the review states

> Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with generally accepted accounting principles.

[Exhibit # 3].

21. The debtor's expert on accounting, Eric Kreuter, a certified public accountant, testified that Raab's accountant, Raymond J. Harting, did not have sufficient documentation to render an unqualified opinion with respect to Raab's financial statement for the calendar year ending December 31, 1984. [Exhibit # 2]. Kreuter said that his inspection of Harting's work papers which formed the basis for the 1984 financial statement revealed:

(a) There were insufficient items reviewed from an internal control analysis.

(b) There was no evidence of confirmations from customers and suppliers as to the status of contracts, accounts receivable or accounts payable. The confirmation of the validity of accounts receivable and accounts payable is generally a accepted accounting principle.

(c) There was insufficient testing of cash collections after December 31, 1984 to prove that receivables were in fact collected.

(e) There was no evidence that Raab's certificate of deposit from Citibank in the sum of $451,033.89 was ever confirmed by the bank.

(f) There was no documentation in Harting's work papers as to Harting's direct observation of inventory; no proof that he tested the inventory figures.

(g) There was no evidence in Harting's work papers to verify the accuracy as to the estimates as to the cost to complete work in progress; no job site visits were revealed.

(h) There is an absence of any documented representations from the management of Raab as to the correctness of the figures in the financial statement; a client's representation letter is a generally accepted principle of accounting.

(i) There was no subsequent events review check list as to events between December 31, 1984 and May 23, 1985, the date that the 1984 financial statement was issued.

22. Kreuter did not dispute the accuracy of any of the figures in the December 31, 1984 financial statement because he did not have sufficient documentation to arrive at any conclusion other than the fact that based on the lack of records, Harting did not have sufficient evidence to render an unqualified certified opinion.

23. Harting was not called to testify in support of his certified opinion. The court will presume, therefore, that his testimony would not be helpful to the debtor; that such testimony would be harmful and that the plaintiff's evidence will be viewed in a favorable light. Hence, the court finds that Harting did not have sufficient evidence to render an unqualified certified opinion with respect to the 1984 Raab fi-

nancial statement which he issued on May 23, 1985. However, there is no evidence to dispute the accuracy of the 1984 financial statement, nor does the debtor contend that this statement is fake or inaccurate.

24. The debtor finds fault with the August 15, 1985 review which Harting issued on October 31, 1986, more than fourteen months after it purchased the Raab stock on August 15, 1985. The debtor contends that Harting's review with respect to the period from December 31, 1984 to August 15, 1985 [Exhibit # 3] required certain retroactive modifications which would reveal that there were substantial negative changes in the financial condition of Raab's business during such period.

25. Kreuter testified that there was an overstatement of revenue earned on the CTI job of $219,718, the Scuillo Job of $20,231; the Steelstat job of $4,047; and the IBM job of $8,700 for a total overstatement of $252,696. [Ex. # 1]. This overstatement resulted from a duplication of the cost of materials entered into the computer at Raab's offices. A new computer was installed by Smyth after August 15, 1985 onto which all the information from the old Raab computer was entered. Whether the duplication was on the old Raab computer or the new one is uncertain. Therefore, the debtor has not established that such a duplication was attributable to Rainaldi's fraud or mistake when the information was entered onto the old computer or to a mistake by the debtor when the information was transferred to the new computer.

26. Moreover, this information was accessed from the new computer by Harting fourteen months later to prepare the August 15, 1985 financial statement. The duplication which occurred was not discovered until the August 15, 1985 financial statement was prepared in December of 1986. In light of the post-closing discovery of the duplication the debtor could not have relied on these numbers and was therefore not mislead about the value of Raab at the time of the closing.

27. In addition, Kreuter's audit indicates that there was "excess paid for stock of Henry F. Raab, Inc. due to duplication of Henry F. Raab Connecticut, Inc. assets" totalling $49,195. Including other various adjustments and a resulting decrease in the overall profitability of the company of 6.7% between the periods of December 31, 1984 and August 15, 1985, Kreuter concluded that the "total quantifiable modification required" was $346,950. [Ex. # 1].

28. Based upon the quantifiable modification, the required expenditures to complete the oustanding jobs, the approximately $50,000 in unpaid taxes and the outstanding loan receivable between affiliated companies of $49,195 [Ex. # 2], Kreuter determined that the actual net worth of Henry F. Raab, Inc. as of the closing date was $425,480. [Ex. # 1].

29. The defendant's accounting expert, Don Guarnieri, testified that the percentage-of-completion method was the customary method of accounting for construction jobs. He further stated that the record keeping he observed was customary in the construction field. However, Guarnieri and Kreuter parted company on the proper beginning contract price to be used to calculate the percentage-of-completion on each job. Kreuter's contract price included the cost of materials of the job. Guarnieri testified that the cost of materials should not be included in the contract price because the contractor was compensated for these costs. This court finds that the appropriate base contract price to be utilized in the financials should not have included the cost of materials for the job.

30. Guarnieri testified that he did not find a duplication of the entry of the cost of materials for the CTI job. However, his review of the debtor's financials was more cursory than Kreuter's review and he did not check the accuracy of the entries.

31. Ultimately, whether or not any duplications or overstatements existed on the August 15, 1985 financial statement, the debtor has not demonstrated that at the time of the closing he was duped by or relied upon the alleged misrepresentations which purportedly existed on August 15, 1985 but were not codified in a financial

statement until fourteen months after the date of the closing.

■ 32. Regarding the decrease in the profit margin between December 31, 1984 and August 15, 1985, and assuming such a decrease occurred, the debtor has failed to establish that this decrease arose out of events other than those in the ordinary course of the debtor's business pursuant to paragraph 4(j) of the Rider to the Stock Purchase Agreement dated July 11, 1985. Therefore, no misrepresentation has been established nor has the debtor substantiated a cause of action for breach of warranty against Rainaldi. Pursuant to paragraph 4(j) Rainaldi only warranted that there were no changes in the nature of the business of the Corporations or the financial condition of their property. The debtor has not established a nexus between the decrease in the profit margin and a change in the nature or financial condition of the business.

■ 33. If the decrease in profitiability was attributable to a decrease in the collection of accounts receivable, Rainaldi is also not to blame for this condition. Paragraph 9 of the Stock Purchase Agreement, dated June 25, 1985, in which the Seller (Rainaldi) warrants the accuracy of the accounts receivable in the statement of assets and liabilities of Raab, Inc. and Raab Connecticut, which was delivered to Smyth in July of 1985, does not guarantee the collectibility of the accounts receivable. The debtor does not dispute the accuracy of the entry and by virtue of this paragraph has no recourse to Rainaldi for the accounts which remain uncollected nor for rescission of the agreement based on misrepresentation.

34. The December 31, 1984 financial statement states loans receivable totalled $293,962 owed by and between affiliated companies. Under the Stock Purchase Agreement of June 25, 1985, Rainaldi was obligated to adjust and clear all intercompany and personal accounts between himself and the two corporations (Henry F. Raab, Inc. and Henry F. Raab Connecticut) and to pay all taxes due and owing. [Ex. # 2]. As of the August 15, 1985 closing date, loans of approximately $50,000 and

taxes of approximately $50,000 were not paid. Subsequent to the closing, Ranaildi paid the taxes with his personal resources. The $50,000 loan was paid by making adjusting entries in the journals of the two corporations after the closing date. The debtor has not proved that Rainaldi acted with an intent to deceive it or with an intent not to fulfill the promise to clear up intercompany loans. Even though the loan should have been paid by the closing date of August 15, 1987, the amount of the loan, which represents less than 3% of the total purchase price of Henry F. Raab, Inc., is not sufficiently material to warrant rescission.

## PROCEDURAL FACTS: STOCK RECLAMATION

35. Pursuant to paragraph 5 of the Stock Purchase Agreement dated June 25, 1985, and paragraph 18 of the Rider to the Stock Purchase Agreement dated July 11, 1985, which amended paragraph 5 described above, Rainaldi acquired a security interest in the 9200 common voting shares of Raab, Inc. and 100 shares of Raab Connecticut as security for the unpaid part of the purchase price for the two corporations.

36. The terms of the agreement upon the debtor's default on the payments of the promissory notes to Rainaldi, as stated in Paragraph 18 of the rider to the Stock Purchase Agreement, requires that:

> If at any time there occurs a default in the payment by the Buyer of principle or interest of any of the installment due under the aforesaid two Notes and said default continues for 45 days the Seller shall notify the Buyer and the Buyer shall have an additional 45 days in which to make said payment and in the event that said default continues without payment for 45 days the Seller shall notify the Escrow Agent and the Escrow Agent shall deliver all of the share certificates pledged as above to the Seller ...

37. The debtor paid only the interest due under the first three monthly promissory notes which it issued to Rainaldi at the closing on August 15, 1985. The debt-

or made no further payments to Rainaldi after November 15, 1985.

38. On January 18, 1987, Rainaldi moved in this court for relief from the automatic stay in the Domestic case so that he might enforce his security interest in Raab and Raab Connecticut to secure its indebtedness to him.

39. On an order to show cause seeking an order vacating the automatic stay and directing turnover of Henry F. Raab to Angelo Rainaldi, a decision was rendered in this court on February 24, 1987 in *Domestic Fuel Corp. v. Rainaldi (In re Domestic Fuel Corp.)*, 70 B.R. 455 (Bankr.S.D.N.Y. 1987) and an order filed on February 27, 1987. This court held that Rainaldi perfected his security interest in the stock in accordance with New York law UCC sec. 8–313(1) and 8–102(1)(a) and no filing was required to perfect the security interest in accordance with UCC 8–321(1). *Domestic Fuel Corp. v. Rainaldi*, 70 B.R. at 464. This court further concluded that the debtor failed to sustain its burden of proof imposed by 11 U.S.C. sec. 362(g)(2) to establish that the plaintiff's security interest was adequately protected and that therefore Rainaldi was entitled to relief from the automatic stay for cause, as authorized under 11 U.S.C. 362(d)(1), because of the decline in the value of the stock and the lack of adequate protection. *Domestic Fuel Corp. v. Rainaldi*, 70 B.R. at 464. Upon the filing of the order Rainaldi attempted to take possession of the stock.

40. Marine Midland Bank, the stakeholder in this case, holds the Raab stock certificates and the endorsed-in-blank stock powers because the parties never designated an escrow agent. It refused to turnover possession of the stock to Rainaldi without a court order. This court declined to issue such an order until the case at bar was litigated.

41. Thereafter, Rainaldi caused a notice, dated March 4, 1987, to be served on Domestic and Richard Smyth, the president of both debtors, of his intention to sell the pledged stock on March 19, 1987, at the offices of Aronwald & Pykett, 925 Westchester Avenue, White Plains, New York on March 18, 1987. The debtor's trial counsel sent a telegram objecting to the sale.

42. On March 19, 1987, a sale of the stock was held. The debtor's agent, an accountant, was present. No bidders other than Rainaldi were present at the sale. Rainaldi's bid of $100 was accepted and Rainaldi made out a bill of sale to himself for the shares, dated March 19, 1987.

43. Rainaldi, in the capacity of sole shareholder of Raab New York and Raab Connecticut, held a shareholders' meeting and elected himself sole director. Immediately thereafter, Rainaldi appointed himself as president and his children as other officers of the two corporations.

44. On March 20, 1987, Rainaldi entered the Raab premises and, as president, took over possession and the operation of the Raab corporation. Rainaldi caused the locks to be changed and excluded the debtor's then president, Richard Smyth, from entering the building.

45. On March 23, 1987, Rainaldi moved pursuant to an order to show cause to have himself authorized to be the sole signatory on the corporate bank accounts and to have the debtor's attorneys Marc Goldberg, P.C. and Sitomer and Odesser replaced by the firm of Aronwald & Pykett. On March 24, 1987, Richard Smyth and the debtor, Domestic Fuel, moved by order to show cause for a preliminary injunction in the adversary proceeding to enjoin Rainaldi from interfering with Raab's business, compelling the ouster of Rainaldi from the premises and for Rainaldi to be held in contempt of the automatic stay and to have the sale on March 19, 1987 declared invalid for failure to comply with this courts order of February 27, 1987 and the requirements of the UCC.

46. On April 3, 1987, this court rendered a decision on a motion and cross-motion regarding the disposition of the pledged stock of Henry F. Raab. *Domestic Fuel Corp. v. Rainaldi (In re Domestic Fuel Corp.)*, 71 B.R. 734 (Bankr.S.D.N.Y. 1987). The court held that Rainaldi's failure to obtain possession of the Raab stock which the debtor delivered to Marine Midland Bank, a financial intermediary which

did not hold such stock as an Rainaldi's agent, prevented Rainaldi from effectively exercising his right of self-help and impaired the validity of the attempted nonjudicial sale of the absolute ownership of the Raab stock, which was held on March 19, 1987. This court granted debtor's motion for an order directing Rainaldi, his servants, agents and employees to remove themselves from the premises of the Raab corporations and to cease interfering with the operations, so long as he has not acquired ownership of the Raab Stock. *Domestic Fuel Corp. v. Rainaldi*, 71 B.R. at 740.

47. On May 4, 1987, the debtor filed an appeal of the February 24, 1987 decision by this court in *In re Domestic Fuel Corp.*, 70 B.R. 455, pursuant to 28 U.S.C. § 158. This appeal is presently pending in the District Court. *Domestic Fuel Corp. v. Rainaldi*, 87 Civ. 3029.

## DISCUSSION

■ Effective rescission requires (a) a lawful right to rescind; (b) due notice of an intention to rescind; and (c) the restoration of benefits received by the party attempting to rescind, so that the other party may be placed in status quo. Even if the most complete right of rescission exists it cannot be exercised without a return or an offer to return such benefits. *Cox v. Stokes*, 156 N.Y. 491, 51 N.E. 316 (1898), *Lee v. The Vacuum Oil Company*, 126 N.Y. 579, 27 N.E. 1018 (1891).

## A. LAWFUL RIGHT TO RESCIND

■ In order to rescind a contract, the party seeking to rescind has the burden of proving that the other party or parties to the contract fraudulently misrepresented facts at the time the contract was entered into. *Tinkess v. Burns*, 24 A.D.2d 545, 261 N.Y.S.2d 472 (1965). *Most v. Monti*, 91 A.D.2d 606, 456 N.Y.S.2d 427 (1982). A party may also seek rescission if it proves that certain material facts were innocently misrepresented to it by the other contracting party. *West Side Federal Savings and Loan Association v. Hirschfeld*, 101 A.D.2d 380, 476 N.Y.S.2d 292, 295 (1984);

*Tinkess v. Burns*, 261 N.Y.S.2d at 473; *Cox v. Stokes*, 156 N.Y. at 506, 51 N.E. 316. If such innocent misrepresentation occurred, rescission of the contract is based on the theory of mutual mistake. *West Side Savings and Loan Association v. Hirschfeld*, 476 N.Y.S.2d at 295. Such a mistake must have existed at the time the contract was signed. *Tinkess v. Burns*, 261 N.Y.S.2d at 473.

### Fraud and Innocent Misrepresentation

■ A cause of action lies in fraud when there has been a representation of a material existing fact, falsity, scienter, deception and injury. *In re White*, 42 B.R. 494 (Bankr.E.D.N.Y.1984); *In re Senty*, 42 B.R. 456 (Bankr.S.D.N.Y.1984). The elements of fraudulent concealment are: (1) a relationship between the parties that creates a duty to disclose; (2) knowledge of the material facts by the party bound to make such disclosure; (3) nondisclosure; (4) scienter; (5) reliance; and (6) damage. *In re White*, 42 B.R. at 498.

■ Innocent misrepresentation results when all the elements of fraud exist except scienter. *West Side Federal Savings and Loan Association v. Hirschfeld*, 476 N.Y.S.2d at 295. An action may be maintained in equity to rescind a transaction which has been consummated through misrepresentation of material facts not amounting to fraud. Unlike an action at law for damages, intentional misstatements need not be proved. *Tinkess v. Burns*, 261 N.Y.S.2d at 473. *See* 5 Williston Contracts (Rev. ed.) sects. 1487, 1540, 1544.

The debtors assert that Mr. Rainaldi fraudulently or innocently misrepresented the financial position of Raab, thereby overstating its purchase value. Such alleged overstatements resulted from purported misrepresentations of (1) the percentage of completion of three of the jobs in process; (2) the failure to adjust and clear intercompany loans and unpaid taxes; (3) duplications and overstatements of revenue in the August 15, 1985 financial statement; and (4) an undisclosed decrease in the profit margin of the debtor. The debtor seeks to rescind the contract, asserting

these misrepresentations were fraudulent or resulted in mutual mistake.

### (1) Percentage of work completed

The debtor's president, Richard W. Smyth, has not established that that he was unaware of the status of the jobs on about August 15, 1985 or that Rainaldi misrepresented the percentage of work completed or acted with deception. In fact, the debtor had visited many of the job sites and was aware of their level of completion. The debtor has not demonstrated that Rainaldi made any other oral or written representations or guarantees regarding the cost of materials or future expenditures needed to complete the work in process outside of those in the Stock Purchase Agreement. Though there was conflicting testimony from Smyth and Rainaldi regarding the percentage of completion on the projects, testimony from Jerome Albert, Raab's former estimator established that the CTI job was 97% complete as of the closing date of the contract, August 15, 1985. Ultimately Raab, under Smyth's ownership, expended and adjusted for a total of $60,000 on three jobs with total contract prices of $1,100,000, 1,200,000 and 1,500,000. Therefore, any expenditures came to less than 2% of the total price of the three contracts. In addition, Smyth visited all the job sites and had access to all the books and records of Raab. Though access to books and records is not a substitute for required revelation, *Weaver Organization, Inc. v. Manette*, 41 A.D.2d 138, 341 N.Y.S.2d 631 (1973), there has not been any material distortion in the representations made by Rainaldi to Mr. Smyth as of the closing.

The debtor insists that because job records were not kept by Rainaldi after his daughter departed from this job, that Rainaldi could not have possibly known the status of completion of the jobs. Regardless of whether or not this is true, Smyth was told by Rainaldi that Smyth should find a replacement for Rainaldi's daughter. If Smyth questioned Rainaldi's basis for making any representations about the percentage of completion of the jobs he had equal access to all the information and was also in a position to have hired an individual to keep the job cost records. *See Marine Midland Bank v. Palm Beach Moorings*, 61 A.D.2d 927, 403 N.Y.S.2d 15 (1978) (Where the defendant had the opportunity to examine corporate records before assuming the obligations reflected in the agreement of purchase, the court held that the defendant must make use of his means or will be estopped from bringing a cause of action that he was induced to enter the obligation). Even if Rainaldi had represented that the jobs were 99% completed and based on the findings above, this representation would not have amounted to either a material fraudulent or innocent misrepresentation.

### (2) Loans between affiliated companies

The December 31, 1984 financial statement indicated loans receivable totalling $293,962 owed by affiliated companies. Under the Stock Purchase Agreement of June 25, 1985 Rainaldi was obligated to adjust and clear all intercompany and personal accounts between himself and the two corporations (Raab New York and Raab Connecticut). [Ex. # 2]. As of the August 15, 1985 closing date approximately $50,000 was still owed on these affiliated company loans. Rainaldi testified that this loan was paid by adjusting certain journal entries in the Raab Connecticut and Raab New York books. This was done after the closing. Smyth claims he believed all affiliated company loans were paid because the Stock Purchase agreement obligated Rainaldi to make these payments. However, the failure to pay this loan until after the closing did not amount to a material fraudulent or innocent misrepresentation by Rainaldi. For fraud, more must be shown than a promise was not kept; it must be proved that there was never any intention to perform. *In re Overmyer*, 30 B.R. 127, 132 (Bankr.S.D.N.Y.1983); *In re Pannell*, 27 B.R. 298 (Bankr.E.D.N.Y.1983). Not every promise as to what will be done in the future can form basis for claim of fraud, since a mere promise without preconceived and undisclosed intention of not performing it only gives rise to action for breach of contract if the failure to perform is materi-

al in nature. *In re Lawrence*, 1 B.R. 402,-405 (Bankr.S.D.N.Y.1979).

■ The debtor has not established that Rainaldi did not intend to keep the promise at the time it was entered into. Though there was a representation in the stock purchase agreement entered into on June 25, 1985, that all intercompany loans were to be adjusted and cleared by the closing date, August 15, 1985, the debtor did not establish that Rainaldi had no intention of keeping this promise or that he represented at the closing that all such loans were paid.

■ Nor was the post-closing adjustment of the corporations' journals to eliminate outstanding loans receivable or the amount of the loan of such a material, fraudulent or misrepresentative nature to justify rescission. The December 31, 1984 financial statement, which was prepared and given to Smyth in May of 1985, informed him that Raab had loans receivables between affiliated companies which totalled $293,962. The outstanding $50,000 loan, as of August 15, 1985, represented less than 3% of the 1.6 million purchase price paid for Raab New York. The debtor did not establish at trial that Rainaldi had represented that he had paid all the affiliated company loans on the closing date. In addition, Smyth, a sophisticated businessman, had access to all books and records of Raab with which he could have assessed the financial status of Raab and any alleged representations made by Rainaldi. Where a party has access to books and records and fails to utilize this access to determine the accuracy of any representations, he is estopped from complaining he was induced to enter certain transactions. The Court of Appeals in *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 322, 184 N.Y.S.2d 599, 157 N.E.2d 597, held:

> [I]f the facts represented are not matters peculiarly within the party's knowledge, and the other party has means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to com-

plain that he was induced to enter the transaction by misrepresentation.

*See Schuster v. Mather*, 133 N.Y. 590, 596, 30 N.E. 755; *Most v. Monti*, 91 A.D.2d 606, 456 N.Y.S.2d 427 (1982); *Armstrong v. McAlpine*, 699 F.2d 79, 88 (2nd Cir.1983); *Higgins v. Crouse*, 147 N.Y. 411, 416, 42 N.E. 6 (1895).

Although access to books and records may not substitute for required revelation, *Weaver Organization, Inc. v. Manette*, 341 N.Y.S.2d 631, 634, the debtor has failed to establish that any material representations were distorted or erroneous or that a cursory view of the books and records would not have informed him of these purported misrepresentations. Therefore, the debtor was not a victim of innocent or fraudulent misrepresentation by Rainaldi.

### (3) Decrease of profit margin

The debtor further alleges that its profit margin has dropped precipitously from 21% as indicated on the December 31, 1984 financial statement to 3% as of August 15, 1985. The debtor asserts this dramatic change in the profit margin is representative of a breach of paragraph 4, section j of the rider which states that there have been no changes in the nature or financial condition of the business other than those arising out of the ordinary course of the business. However, a causal nexus has not been established between the drop in the profit margin and changes in the nature or financial condition of the business.

Moreover, Raab has not presented any evidence that any representations or warranties were made regarding the consistant or average profit margin of the debtor.

■ Even if such representations or predictions were made regarding the earning potential of Raab, they would not arise to the level of a warranty. A statement that a business will yield large profits is promissory and a matter of opinion and is not the basis of an action for fraud. 24 N.Y.Jur., Fraud and Deceit sec. 36 at 140–41; *CPC Intern., Inc. v. McKesson Corp.*, 120 A.D.2d 221, 507 N.Y.S.2d 984, 989 (1986). Mere predictions may not form a basis for an action for fraud when both parties have equal access to the facts, or

when it is obvious that the declarant is using a subjective standard. *Magnaleasing, Inc. Staten Island Mall*, 428 F.Supp. 1039, 1042–43, *aff'd* 563 F.2d 567 (D.C.S.D. N.Y.1977). (Where the defendant misrepresented the volume and rate of leasing in the mall and the taxes the plaintiff would pay per square foot, the court held that the defendant had superior knowledge to which the plaintiff did not have equal access and was liable for these intentional misrepresentations); *West Side Federal Savings and Loan v. Hirschfeld*, 101 A.D. 380, 476 N.Y.S.2d 292, 294–95 (1984). The debtor had equal access to all books and records prior to and after the closing and may not assert that it relied upon oral representations by Rainaldi as to the future profitability of the business.

## B. DUE NOTICE OF INTENTION TO RESCIND

 Notice of an intention to rescind was not received until approximately fourteen months after the closing date of August 15, 1985. There can be no rescission of a sale where the breach of contract or fraud has been waived by the party who claims to have been wronged. The right to rescind must be exercised promptly after the injured party learns of the wrong. *New York Telephone Co. v. Jamestown Telephone Corp.*, 282 N.Y. 365, 26 N.E.2d 295 (1940). Such a delay will result in laches and bar a cause of action.

> Laches is not like a limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced-an inequity founded upon some change in the condition or relations of the property or parties.

*MacNamee v. Bankers' Union for Foreign Commerce & Finance*, 25 F.2d 614 (2d Cir.1928). Shareholders who claim to be relieved on the ground of fraud must act with the utmost diligence and promptitude. *MacNamee v. Bankers' Union*, 25 F.2d at 617; *Upton v. Tribilcock*, 91 U.S. 45, 55, 23 L.Ed. 203 (1875) (the effect of laches upon rescission of a stock subscription involving conflicting claims between creditors and defrauded shareholders). Not only will neglect to act after knowledge of the fraud bar relief, but it is said that one must use diligence to discover the fraud or misrepresentation. *MacNamee v. Bankers' Union*, 25 F.2d at 617.

 Smyth testified that he "discovered" the misrepresentations made by Rainaldi in October of 1985. [Interrogatory of Richard W. Smyth at 7, June 30, 1987]. He stated he met with Angelo and Frank Rainaldi to discuss the discrepancies. Yet, Smyth did not bring suit for rescission of the Stock Purchase Agreement until over a year after the closing date of August 15, 1985 and for a year after he discovered the misrepresentations. In the meantime Smyth has derived income from Raab and acquired new jobs through Rainaldi's efforts. The court did not regard as relevant proposed testimony from Smyth as to subsequent meetings with Rainaldi and why the debtor did not bring suit upon learning of the alleged misrepresentations. Regardless of the debtor's reasons, the fact remains that the debtor continued to accept the income from the Raab corporations which it acquired until the commencement of this suit. It would appear inequitable to allow Smyth, at this time, to rescind the Stock Purchase Agreement after such a long period has transpired and the parties' positions have changed.

## C. RESTORATION OF BENEFITS

 Even if the right of rescission exists it cannot be exercised without a return or an offer to return all benefits. *Cox v. Stokes*, 156 N.Y. at 507, 51 N.E. 316. Assuming that the debtor had the right to rescind because of fraud or mutual mistake, and that its notice of intention to rescind was sufficient, there was no valid rescission because the debtor failed to offer the benefits and to place Rainaldi in the same position that he was in when the contract was made. *Cox v. Stokes*, 156 N.Y. at 167, 51 N.E. 316.

The debtor asserts that as a result of the misrepresentations by Rainaldi, the value of Raab was overstated by approximately $500,000 and that in reality Raab only had a net value of approximately $425,000 as of

August 15, 1985. The debtor now claims that Raab is worth $750,000 and that if rescission is granted the debtor will be returning a corporation to Rainaldi with an increase in net value of approximately $300,000. This court has not found that any material misrepresentations were made by Rainaldi which decreased the net value of Raab. Assuming there were any misrepresentations they were discovered when the August 15, 1985 financial statement was prepared, in December of 1986. In any event, the debtor has not established that it reasonably relied upon these misrepresentations or that they were stated at the time of closing. It is thus unreasonable to accept the debtor's conclusion that it is returning to Rainaldi a more valuable company. It has also been determined that as of February 24, 1987, the financial condition of the Raab corporations had deteriorated, which adversely impaired the value of the Raab stock which was pledged to Marine Midland Bank. *In re Domestic Fuel Corp.*, 70 B.R. at 459. There has not been any testimony or evidence which establishes that Raab's financial condition is now the equivilent of its condition as of August 15, 1985. Therefore, unless the debtor offers to compensate Rainaldi for any possible financial change Rainaldi will not be placed in the same position that he was in when the contract was made.

In addition, there was unrebutted testimony that Smyth has derived an income from Raab. Though the amount of the income was not specified, Smyth has not offered to return this benefit to Rainaldi. Therefore Smyth is not entitled to rescission.

## RECLAMATION OF STOCK

This court's decision dated February 24, 1987, *In re Domestic Fuel Corp.*, 70 B.R. 455 (Bankr.S.D.N.Y.1987), held that Rainaldi acquired a perfected security interest in the stock and was entitled to have the stock turned over to him because the debtor failed to comply with the payments on the promissory notes recited in the Stock Purchase Agreement and the rider annexed to this Agreement. However, this court declined to issue a court order compelling Marine Midland Bank to turn over the stock until litigation of the issue of whether rescission of the Stock Purchase Agreement is warranted.

This court holds that rescission is not warranted and therefore a court order may be issued to compel Marine Midland to turnover the stock to Rainaldi.

Though the February 24, 1987 decision of this court is on appeal in the District Court, *Domestic Fuel Corp. v. Rainaldi*, 87 Civ. 3029, a stay has not been filed in the bankruptcy court or in the District Court pursuant to bankruptcy rule 8005, which would restrain compliance with the order filed in the bankruptcy court in conformity with the decision of February 24, 1987 in *In re Domestic Fuel Corp.*, 70 B.R. 455.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

2. The debtor has not established that it is entitled to rescind the Stock Purchase Agreement and that Rainaldi, either fraudulently or innocently, misrepresented the value Henry F. Raab, Inc. or Henry F. Raab Connecticut.

3. Even if the debtor had proved material misrepresentations on the part of Rainaldi, the debtor did not give due and timely notice of its intention to rescind and is barred from pursuing this cause of action.

4. The debtor did not restore or offer to restore benefits received while in control of Raab so that Rainaldi may be placed in the same position that he was in when the contract was made. Therefore Smyth and the debtor are not entitled to rescission of the Stock Purchase Agreement.

5. Accordingly, the holding of this court in *Domestic Fuel Corp. v. Rainaldi (In re Domestic Fuel Corp.)*, 70 B.R. 455 entitles Rainaldi to assert his secured interest in the Raab stock pledged to the Marine Mid-

land Bank and to recover the stock from Marine Midland Bank.

SETTLE ORDER on notice.